*In re* MARRIAGE OF WARD R. DUNSETH, Petitioner and Counterrespondent-Appellant, and BARBARA HAZELRIGG DUNSETH, Respondent and Counterpetitioner-Appellee.

Fourth District    No. 4—93—0365

Opinion filed April 14, 1994.

LUND, J., specially concurring.
STEIGMANN, J., specially concurring.

Philip Schickedanz, of Springfield, for appellant.

Gregory A. Scott, of Scott & Scott, P.C., of Springfield, for appellee.

JUSTICE COOK delivered the opinion of the court:

Petitioner Ward R. Dunseth appeals from the trial court's division of marital property, direction that he pay respondent Barbara H. Dunseth $1,700 monthly in permanent maintenance, and order sentencing him to 30 days in jail for contempt. We affirm in part, reverse in part, and remand to the trial court.

Ward and Barbara were married in Las Vegas, Nevada, in 1978. That was the second marriage for both, and no children were born of the marriage. The parties separated at the end of July 1991, when Ward was 67 and Barbara was 57 years old. Ward worked as a doctor prior to and throughout the marriage, practicing surgery at Passavant Hospital in Jacksonville, Illinois, and consulting and performing minor surgeries in private offices in Jacksonville and Springfield, Illinois. In July 1991, Ward's privileges at Passavant Hospital were restricted due to the death of a patient. The restrictions required Ward to consult with another surgeon before every operation. Ward refused to practice under those conditions and moved his practice to Doctors Hospital in Springfield, but later agreed to the conditions. The number of surgeries he performed at Passavant, however, rapidly decreased. In February 1992, Ward's surgical privileges at Passavant were suspended and he began to practice exclusively at Doctors Hospital. About the same time, Ward closed his Jacksonville office and opened an office in Carlinville, Illinois.

Ward collected antiques and Indian artifacts and during the marriage he bought a Lincoln desk at a two-day auction. Barbara took the desk with her when she moved out of the former marital home, stating, "I felt as though he bought the desk for me." Ward and Barbara purchased a cabin which they filled with antiques, an antique sleigh, and two antique wagons; they collected cranberry glassware throughout the marriage. The couple owned five lawnmowers, including one worth $5,000 on which a $4,700 debt remained. Ward testified he owned 200 of 650 shares in a medical corporation consisting of two buildings, a heliport, and a complete medical facility in Jacksonville from which he ran his practice. In his lifetime, he had owned three helicopters and one plane, as well as two motor homes. In addition, the parties owned five Cadillac automobiles,

including a 1989 Cadillac Ward had bought for Barbara, upon which he still owed approximately $15,000 and on which he paid $478 per month. Ward owned property which was formerly occupied by a gas station, and he leased very expensive medical equipment for his practice, including a $20,000 complex of laparoscopy instruments leased in March 1991. Ward testified the value of such equipment depreciated almost as soon as it was acquired, much like the value of a new car. Nevertheless, Ward signed a contract on October 24, 1991, to lease surgical equipment over five years at a cost of $45,000. Monthly payments for that equipment totaled $1,350, and he had additional monthly equipment lease payments of $357.49.

Ward's adjusted gross income, as reported on his income tax returns for the years 1987 through 1990, was $102,497 in 1987, $230,573 in 1988, $216,801 in 1989, and $246,937 in 1990. Ward's gross income in 1991 was $454,971. In September 1991, the Internal Revenue Service (IRS) filed claims for Federal tax liens against Ward and Barbara for the years 1987 through 1990, totaling $281,834. Ward testified he did not pay all of his taxes in those years and used his available funds primarily for business expenses, since he was operating at a loss.

Ward left Barbara in July 1991, taking his girlfriend, Debbie Morrell, on a four-day weekend vacation in his motor home. Debbie was an employee in Ward's office whom he claimed had hospital experience, although she was not a licensed nurse. She received a 25% salary increase in September 1991, which brought her salary to $1,600 a month. Debbie accompanied Ward to New York City in October 1991, where the couple stayed at the Waldorf Astoria for seven nights while Ward attended a medical conference. Ward claimed he was required to attend this conference to keep current on his continuing medical education credits; nevertheless, while in New York, Ward dined with Debbie at the Russian Tea Room, and spent $294 on theatre tickets and approximately $3,000 on the entire trip. In 1992, Debbie accompanied Ward to medical conferences at the Mayo Clinic and in Luxembourg, where Ward spent another $1,800 over the period of a week. Debbie moved into the marital residence with Ward after he received exclusive temporary possession of the home through a stipulated order in August 1991. Debbie lived there rent-free but paid for some food expenses. Ward stated Debbie did not receive a paycheck in December 1991, and on various other occasions due to his declining income. Ward gave Debbie a $1,400 ring and agreed to have the former marital residence painted and carpeted, although he claimed Debbie paid for the remodeling expenses. Shortly after he closed his Jacksonville office and opened the of-

fice in Carlinville, Ward made plans to move into Debbie's newly purchased $114,000 home in Carlinville.

After graduation from high school, Barbara worked for Caterpillar Tractor Company as a switchboard operator until she was married and had children. In 1967, she began working for the First Baptist Church as a secretary, quitting in 1976. She then worked briefly for Ward in his office as a receptionist until they married. Soon after the marriage, the parties sold Barbara's home for $38,900, and Barbara turned over the proceeds to Ward. Barbara testified Ward gave her 1975 Mustang to his son shortly after the marriage. Ward was "very generous" with his money, buying jewelry and spending $3,000 at a time on designer outfits for Barbara. Ward estimated he spent a total of $30,000 to $40,000 on Barbara's clothes during the marriage. He also gave her between $1,000 and $2,000 in cash every month, out of which Barbara was expected to pay for utilities, garbage pickup, food, and any personal necessities. The couple ate out often and went on vacation approximately four times a year because Ward needed to get away. The parties visited Edinburgh, Scotland, twice in 1990 and stayed there for three weeks at a time, while Ward took an examination so he could become a Fellow of the Royal College of Surgeons and add this membership to his letterhead. The parties had planned a trip to Europe for July 1991, but after Ward moved out of the marital residence, Barbara cashed in her $1,300 plane ticket and placed the money in escrow with her attorney pending the property settlement.

Barbara stated Ward handled all financial matters during the marriage and never consulted her about obtaining loans, leasing medical equipment, or buying and selling his helicopter. Regarding the parties' income tax returns, Barbara stated she "signed on the dotted line" because Ward told her to do so. She acknowledged she signed one of his medical equipment leases in 1990 and added she "would have signed anything." Barbara knew there were money problems relatively early in the marriage, as Ward had borrowed $23,000 from her mother in 1983. In addition, she admitted at one hearing she had known about the IRS for years, as they had emptied her checking and savings accounts and had taken a certificate of deposit she had acquired prior to the marriage. In the spring of 1991, Barbara signed a note to borrow $50,000 which Ward indicated would go to the IRS. However, she was unaware of any payments made by Ward to the IRS. Barbara testified an IRS agent visited her and said if Barbara went to work, the IRS would garnishee her wages to pay for the couple's tax liability. She then admitted she had not attempted to find work since the parties' separation.

The parties agreed to a temporary order on August 12, 1991, which provided Ward would pay Barbara $1,250 in maintenance for August and September 1991, with payment due the 15th of each month. If the parties could not agree upon future temporary maintenance payments, either could petition the court to conduct a hearing between September 15 and October 1, 1991. Barbara was granted exclusive possession of the 1989 Cadillac, and Ward was ordered to forward two separate checks, payable to Farmers State Bank, in the amount of the car's monthly loan payment. Ward was granted exclusive temporary possession of the marital home, while certain items of personal property Barbara had taken from that residence were ordered returned to Ward. The order enjoined each party from removing any marital or nonmarital property from the marital residence and from concealing, encumbering, or destroying any such property until further order of the court.

Barbara filed a petition for rule to show cause in September 1991, alleging Ward had failed to make the August temporary maintenance payment by the 15th in the amount required and failed altogether to make the August car payment. Barbara also petitioned for an extension of temporary support.

On September 27, 1991, the trial court heard evidence on the petitions. Ward testified he made the August temporary maintenance payment and the August and September car payments but did not make the September maintenance payment because Barbara had not returned all of his personal property. Regarding Barbara's petition for temporary support, Ward testified there had been a significant decrease in his income as a physician within the few months prior to the parties' July 1991 separation. Following his July 1991 partial suspension from Passavant Hospital, Ward's gross income, which had averaged $40,000 per month, decreased to approximately $20,000 per month. In August 1991, Ward's gross income was $35,000, based on collection of accounts receivable from previous months, but his gross income for September, through the 27th, was $18,842. Ward stated his September income would not cover his current business expenses; in fact, he was reducing his staff, and further reductions might be necessary. Ward mentioned the IRS liens, indicated he had offered his motor home, on which he owed substantial debt, for sale, and stated the debt on the former marital home remained approximately $128,000. In fact, virtually everything the parties owned was mortgaged or had had a lien placed upon it. Ward claimed he was unable to continue payments on the 1989 Cadillac. He then stated he was keeping his expenses to a minimum, not supporting Debbie, and was behind only on the IRS payments.

The maintenance Barbara received from Ward was her only source of income. Barbara was unemployed and did not know how to operate a word processor, had back problems and a history of cancer which had necessitated a hysterectomy, and lived with her mother and slept on a fold-out bed prior to moving to her four-room apartment. She had "lost 20 pounds over this" and requested maintenance of over $2,000 a month, including $400 a month for food and $50 a month for lunches, $510 per month for the car payment, and $250 per month for insurance, gas, and repairs.

On November 26, 1991, the trial court ordered Ward to pay Barbara $2,000 per month in temporary maintenance, in addition to the car payment, insurance, and any repairs on the car. The court further ordered the parties to refrain from incurring any unnecessary expenditures or debts, not including the ordinary and necessary expenses attendant to Ward's medical practice, and prohibited the parties from transferring, concealing, or selling any property without the written consent of the other party. Although it refused to find either party in contempt, the court ordered payment of the September maintenance payment by 4 p.m. that afternoon and payment of future maintenance checks on the 15th of each month.

On December 26, 1991, Ward filed a petition to modify the temporary order, asserting a substantial change in circumstances precluded him from paying the December maintenance in full. Ward had paid Barbara only $1,000 for December and had only paid the interest portion of the December car payment. Barbara filed a petition for rule to show cause on January 6, 1992, alleging nonpayment of the entire December maintenance payment.

At the January 15, 1992, hearing, Ward stated an IRS agent visited his office on December 15 and he gave her a check for $3,000. The IRS agent instructed Ward to dispose of personal property, real estate, and all but two vehicles in order to facilitate payment to the IRS. When asked why he did not refuse to pay the agent, Ward responded, "I don't refuse the IRS, sir." On cross-examination, Ward admitted the check was dated December 19, four days after the maintenance payment was due, but insisted his December 15 bank balance of approximately $7,000 did not account for checks which had yet to be cleared.

Ward's practice collected $39,851.23 in September, $31,926.66 in October, $26,605.55 in November, and $19,094.13 in December 1991. He stated the minimum amount required to operate his office was approximately $24,000 per month, and he did not make the court-ordered payments to Barbara in December because he lacked the funds. In fact, Ward borrowed money from a credit card to pay his

malpractice insurance, due January 1. He stated he knew the IRS was going to visit his office December 15 but was unaware it would request money on the spot; it usually levied against his bank account after such a visit. After agreeing to the surgical consultation restriction, Ward had performed only two surgeries at Passavant Hospital in four months.

The court denied Ward's petition to modify, stating Ward failed to meet his burden of proving that a substantial change in circumstances had occurred. The court found Ward had had a bad month but stated that was not sufficient evidence for the court to modify the temporary support. The court further found Ward in contempt for failing to pay maintenance on December 15 and reserved ruling on sanctions.

Ward filed a second petition for modification of the court's temporary support order on March 17, 1992, in which he again alleged a decrease in income and stated the IRS had levied on his accounts receivable and his surgical privileges at Passavant Hospital had been permanently suspended. Following Ward's nonpayment of the March 1992 maintenance payment, Barbara filed another petition for rule to show cause.

A hearing on these petitions was held April 21, 1992. Ward testified that due to loss of income in the preceding few months, he could not pay the full $2,000 in maintenance to Barbara on the 15th of March and April, so he instead paid $1,000 for each period. Ward's gross income was $24,814.35 in January, $29,945.64 in February, and $24,139.10 in March 1992. His total income in 1991 was $454,971.09, or approximately $34,000 per month. Ward stated the number of surgeries he performed had decreased from one or two majors and two minors a day to two or three majors and two or three minors a week. He attributed his decrease in surgeries to the restrictions placed on, and the subsequent permanent suspension of, his surgical privileges at Passavant.

In March 1992, the IRS had requested a list of all Ward's accounts receivable and sent notices of levy to all Ward's patients, indicating the Dunseths owed the IRS almost $324,000 and directing the patients to pay the IRS rather than Ward. The IRS also garnisheed Ward's checking account, despite his plea that all these levies would likely lead to bankruptcy. Ward testified his basic monthly business expenses totaled $27,300 and he had been unable to pay in full his child support obligation in March and April. Regarding Barbara's maintenance, Ward stated, "I cannot pay $2,000 a month. I don't have it." Ward made his medical equipment lease payments for March, but could not for April. He continued to meet his monthly

mortgage payment, charged $1,500 worth of furniture to his credit card in September or October 1991, bought over $500 worth of music equipment in November, paid Debbie a salary of $679 on February 28, 1992, and was only a month or two behind on car payments for the cars in his possession.

The parties stipulated that the February maintenance payment was made February 25, a $1,000 payment was made March 31, and a second $1,000 payment was made April 17, 1992. Barbara testified the IRS appropriated the $100 in her checking account and the $400 in an individual retirement account which she had opened to try to obtain medical insurance for herself as a high-risk patient through the State pool. The bank which owned the note on the 1989 Cadillac contacted Barbara and demanded payment of $1,700 because the last payment had been made in December 1991.

The court found there had not been a substantial change in circumstances to support the petition to modify and found Ward's monthly income was fairly constant and in excess of the December 1991 income that was the basis of the first petition to modify. Given Ward's 1992 average gross monthly income of $25,000, the court determined the $2,000 monthly payment to Barbara was less than 8% of Ward's income and could not find such a payment unreasonable. The court then took Barbara's petition for rule to show cause under advisement.

On July 13, 1992, Barbara's attorney forwarded to the court an order for rule to show cause, and the court entered that order on July 14, 1992. A hearing on this rule was held July 22, 1992. Ward testified he was overdrawn by $4,000 at his bank, he was behind a total of $25,600 on rent for his two offices, the IRS had levied his bank account in February and the State of Illinois did so in June 1992, obtaining about $1,000, and he could only afford to pay Barbara $1,000. He continued to keep his mortgage payment and lease payments for medical equipment current.

The court found Ward in contempt for failing to abide by the court's orders and ordered Ward to pay Barbara $2,000 per month in maintenance thereafter. The court also found Ward in arrears in the amount of $5,000 in maintenance and ordered him to pay this arrearage within 45 days, and the arrearage on Barbara's car within eight days. The court entered an order on October 27, 1992, finding Ward in contempt and entering judgment in favor of Barbara for $6,000 in temporary maintenance through September 30, 1992, and for Barbara's attorney fees of $2,492.50 through the July 1992 hearing. In addition, the court ordered Ward to pay $1,000 per month on the arrearage in the temporary maintenance and bring the loan on Barbara's car current.

A hearing on property, support, and all remaining issues was held November 17, 1992. Colleen Gregory, a bookkeeper at Ward's office, and Ward testified as to his business income for 1992. Financial records from his medical practice were introduced into evidence. Plaintiff's exhibit No. 1 showed gross earnings in 1992 to date of $236,604.13 and business expenses of $190,602.27. Plaintiff's exhibit No. 2 showed payments to Ward from the business in the amount of $42,788.45. From that amount, $13,000 went to Barbara as temporary maintenance, $3,672 was court-ordered child support Ward paid for a child from a previous marriage, and $1,159.61 was spent on Ward's medical insurance. The $24,956.84 balance was Ward's disposable income to date for 1992.

Accounts receivable totaled $121,830.89, of which $95,641.63 were over 90 days old. The IRS had again placed a lien on these accounts for back taxes. In addition, Professional Leasing, one of the lessors of Ward's medical equipment, notified Ward it had a lien on his accounts receivable and indicated it would repossess all the leased equipment if Ward continued to miss payments. He testified the former marital residence was being sold and the IRS would receive any net proceeds after payment of mortgages on the real estate. The Illinois Department of Revenue had also attached his accounts receivable and had required Ward to pay $2,500 on his back State taxes or it would take action to suspend his medical license. At the time of the hearing, the total amount owed the IRS was $368,636.04. Ward listed his total debts as of January 1, 1992, at over $1 million. He had further reduced his office staff, was behind in his medical equipment lease payments, and stated his malpractice insurance for 1993 would amount to $32,000. The first payment, due December 15, 1992, would be $8,000.

Barbara testified her current monthly living expenses were $2,113. She had borrowed approximately $7,500 from her mother and had insufficient funds to pay the gas and electric bills. The 1989 Cadillac had been repossessed by the bank, so she was without transportation. The parties then stipulated as to the value of certain items of personal property the rightful owner of which was in dispute. The court took the matter under advisement. On December 11, 1992, at a hearing to review payment of temporary maintenance, the court sentenced Ward to 30 days in jail for his contempt but stayed the mittimus until further hearing.

A further hearing on the sentence of contempt was held January 11, 1993. Ward testified his income for the first 17 days of December 1992 was $3,707. In December, the IRS had again levied on his accounts receivable, and his bank account remained overdrawn. He

was still in the process of moving his practice from Jacksonville to Carlinville and indicated that, due to overdue outstanding loans at various area banks and those banks' decisions to press charges, he had no prospects of obtaining the money due to purge himself of contempt in the near future. The court stayed the mittimus to allow Ward another month to determine whether his practice in Carlinville would succeed.

The court filed a memorandum decision on February 18, 1993, in which it determined Barbara had had little or nothing to do with Ward's financial dealings and therefore deemed it inequitable to hold her responsible for payment of any debts. The court noted, however, the marriage was one based on overindulgence, lavishness, and lack of responsibility of both parties. Although this was definitely a case for maintenance, the court indicated there was no evidence to suggest Barbara could not regain employment similar to her former positions to help with her expenses. The court found Ward's credibility concerning his financial situation "suspect at best" and ordered Ward to pay the entire marital indebtedness and the entire indebtedness to the State and Federal governments, to reimburse Barbara for all monies garnisheed from her accounts, and to convey his stock in the Medical Development Corporation to Barbara by execution of a stock transfer. The court also awarded Barbara one-half of the accounts receivable on medical services prior to November 15, 1992, not seized by the IRS, and awarded maintenance of $1,700 per month, payable the 20th of each month, commencing with March 1993. Barbara was awarded the 1972 Cadillac, the antique wagons, the antiques in the shed, the sleigh, the Lincoln desk, the cranberry glassware, her $1,000 insurance policy, and the $1,300 plane ticket refund, while Ward was awarded his Indian artifacts, the totem pole, the notes to Medical Development Corporation, the 1973 and 1978 automobiles, his insurance policy, the Illinois Municipal Retirement Fund pension, and the newest lawnmower, on which he was required to make payments. The court found Ward had dissipated $17,000 in marital assets and ordered him to pay Barbara $8,850 for this dissipation by January 31, 1993, and $2,000 toward her attorney fees within 180 days. To ensure payment by Ward, the court placed a lien in favor of Barbara on Ward's Medical Development Corporation notes and his Indian artifacts, including the totem pole. Judgment was entered March 8, 1993.

On March 2, at a hearing on all pending matters, arguments were heard and the court sentenced Ward to 30 days' incarceration in the Morgan County jail. The court provided Ward could purge himself by making full payment of all maintenance due by April 10,

1993. Ward's post-trial motions, including a motion to reconsider the sentence of contempt, were denied. This appeal followed. On April 8, 1993, the court ordered a stay pending appeal with bond set at $2,500. Ward posted the bond.

■ Ward first argues the trial court's failure to accept his two requests for modification of temporary maintenance was error. The party seeking modification of a maintenance order has the burden of persuading the trial court that a change in maintenance is justified. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 287, 469 N.E.2d 167, 176.) A change in maintenance is justified only where the moving party can demonstrate a "substantial change in circumstances." (750 ILCS 5/510(a) (West 1992).) A showing that some significant misfortune has taken place does not always mean maintenance will be terminated. The decision to modify maintenance is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *In re Marriage of Roach* (1993), 245 Ill. App. 3d 742, 749, 615 N.E.2d 30, 34.

The trial court denied Ward's initial petition for modification of temporary maintenance because it determined he had not proved a substantial change in circumstances. Despite the reduction in Ward's surgery practice and his December 1991 income of only $19,000, the court found Ward's income had merely dipped in December and, without further evidence, could find no such substantial change. At the second modification hearing, where Ward testified to the IRS levy on his accounts receivable, the court determined no substantial change had occurred since the last modification hearing, as Ward's average monthly income in the first few months of 1992 was $25,000. We agree that when a maintenance payor's income fluctuates a temporary decline does not always necessitate modification. The trial court here properly left the burden of proving a substantial change of circumstances to Ward, and we cannot say its determination that no such change occurred was an abuse of discretion.

We question whether an order awarding temporary maintenance, or an order refusing to modify a temporary award of maintenance, may be appealed. Temporary orders certainly may not be appealed immediately, on an interlocutory basis, before the entry of a final order. (See *In re Marriage of Kitchen* (1984), 126 Ill. App. 3d 192, 194, 467 N.E.2d 344, 346 (temporary child support order not an injunction which could be appealed under Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307 (a)(1))).) Once the final order is entered it must be assumed that the trial court has thereby adjusted for any inequity in its temporary orders. (See *In re Marriage of Meyer* (1990), 197 Ill. App. 3d 975, 979, 557 N.E.2d 242, 245.) On appeal we should consider

whether the trial court's *final* order, its overall resolution of the issues, is erroneous, not whether some part thereof is erroneous. An award favoring petitioner on one part of the case may be balanced by an award to respondent on another.

Ward challenges the court's refusal to modify its temporary orders in order to support his attack on the court's contempt order. In most cases a contempt proceeding cannot be used as a method for attacking a court's order which has become final, unless that order is void. (*In re Marriage of Betts* (1990), 200 Ill. App. 3d 26, 62, 558 N.E.2d 404, 428 (erroneous orders must be obeyed); *People v. Rodriguez* (1988), 169 Ill. App. 3d 131, 139, 523 N.E.2d 185, 190 (void order).) Most civil contempt proceedings (at least in the enforcement area) deal with final orders, because most orders are not enforceable until they are final. Temporary orders in dissolution of marriage cases present an exception; they are enforceable, even though they may not then be final or appealable. We conclude that Ward may attack the court's refusal to modify its temporary maintenance orders as a part of his attack upon the court's order finding him to be in contempt. Ward gains no great advantage in that because inability to pay is always a defense to civil contempt. Apart from the question of contempt, we hold that a temporary order is appealable only to the extent it is continued in effect by the court's final order.

■ Ward next contends the trial court erred by finding him in contempt for failing to pay the full amount of temporary maintenance, and by failing to offer him an opportunity to purge himself of contempt. The penalties assessed in a civil contempt case can only serve to coerce the contemnor to comply with a court order, and they must cease when the contemnor complies. (*In re Marriage of Carpel* (1992), 232 Ill. App. 3d 806, 823, 597 N.E.2d 847, 859, citing *Betts*, 200 Ill. App. 3d at 44, 558 N.E.2d at 416.) In other words, a court in any civil contempt proceeding must allow the contemnor an opportunity to purge his contempt. (*In re Marriage of Betts* (1987), 155 Ill. App. 3d 85, 103, 507 N.E.2d 912, 924.) The purging provision in any civil contempt sanction for nonpayment must be based on the contemnor's ability to pay. (*Betts*, 200 Ill. App. 3d at 44, 558 N.E.2d at 416; *Betts*, 155 Ill. App. 3d at 103, 507 N.E.2d at 924-25.) Thus, "[i]f the contempt sanction is incarceration, the respondent's circumstances should be such that he may correctly be viewed as possessing the ' "keys to his cell." ' " (*Betts*, 200 Ill. App. 3d at 44, 558 N.E.2d at 416, quoting *Logston*, 103 Ill. 2d at 289, 469 N.E.2d at 177.) Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court will not disturb the trial court's finding unless it is against the manifest weight of the evidence or the record reflects an

abuse of discretion. *In re Marriage of Lyons* (1987), 155 Ill. App. 3d 300, 308, 508 N.E.2d 458, 464, citing *Logston*, 103 Ill. 2d at 286-87, 469 N.E.2d at 176.

When the court determined Ward had twice failed to comply with its orders, it found him in contempt and ordered him to pay $1,000 per month on the $6,000 arrearage in maintenance payments, plus the arrearage in car payments, and to continue with the $2,000 monthly temporary maintenance payments. In March 1993, when Ward's maintenance arrearage had risen to $10,000, the court sentenced him to 30 days in the Morgan County jail but provided Ward could purge himself by paying all arrearages by April 10, 1993. Although Ward asserts he was not given "the keys to his cell" because he had no funds with which to pay off the accrued maintenance and car payments, the trial court found otherwise. Ward continued to make large payments toward his mortgage, equipment leases, and malpractice insurance, and he made certain he had enough food and money for utilities. Despite the IRS lien on his accounts receivable, Ward continued to collect sufficient funds which would have enabled him to pay the $2,000 per month and the additional $600 or so to make Barbara's car payments; the trial court found he simply prioritized other payments. Ward contends this prioritization was in both his and Barbara's best interests, suggesting if he failed to attend medical conferences and keep his continuing medical education credits current, his medical license would be in jeopardy, and if he failed to keep current on his equipment lease payments, that equipment would be repossessed. Ward asserts either of these circumstances would curtail his earning ability. However, the evidence indicated Ward had more than enough continuing medical education credits. In addition, Ward testified he probably could practice without the equipment, although he strongly felt the hospitals' equipment was inferior.

Noncompliance with a court order to make support payments is *prima facie* evidence of contempt. (*Lyons*, 155 Ill. App. 3d at 307, 508 N.E.2d at 463.) Once a court finds failure to pay has been demonstrated, the burden then shifts to the alleged contemnor to prove the conduct was not wilful. (*In re Marriage of Cierny* (1989), 187 Ill. App. 3d 334, 346, 543 N.E.2d 201, 209.) A clear defense to contempt exists where a person's failure to obey an order to pay is due to insolvency or other misfortune, unless that inability to pay is the result of a wrongful or illegal act. *Betts*, 155 Ill. App. 3d at 100, 507 N.E.2d at 922, citing *Sullivan v. Sullivan* (1973), 16 Ill. App. 3d 549, 552, 306 N.E.2d 604, 606.

Ward contends his failure to pay was not wilful and insists that

since he was unable to make the maintenance payments, the trial court's decision to hold him in contempt was error. At the first modification hearing, the trial court heard testimony that Ward paid Debbie a $1,600 salary in November; took her on a $3,000 trip to New York in October, where they stayed at the Waldorf Astoria and saw a $294 show; gave a $3,000 check to the IRS four days after the December maintenance payment was due; and continued to single-handedly pay the mortgage and utility payments, even though Debbie was living with him. At the second modification hearing, the court heard evidence that Ward had spent $1,500 on furniture in St. Louis, $500 on music equipment, $1,400 on a ring for Debbie, and had taken a $5,000 cash advance in January 1992. While Ward had not made payments on Barbara's car for over four months, he was only one or two months behind on his car payments, and had found $679 in salary for Debbie by the end of February. In January 1993, the court heard Ward had taken a trip to Luxembourg with Debbie, on which he spent $1,800. As mentioned above, the court found Ward was able to make payment to Barbara but had chosen to spend his money in other ways. The trial court's determination that Ward's failure to pay was wilful certainly was not against the manifest weight of the evidence. Given these facts, we cannot say the trial court abused its discretion in finding Ward in contempt and sentencing him to 30 days in jail for that contempt.

Ward next asserts the trial court erred in finding he dissipated $17,000 in marital assets and ordering him to reimburse Barbara one-half of that amount. Dissipation is defined as the use of marital property for one spouse's benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 497, 563 N.E.2d 494, 498-99; *In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 983, 605 N.E.2d 670, 683.) Whether a given course of conduct constitutes dissipation depends upon the facts of each case. (*Tietz*, 238 Ill. App. 3d at 983, 605 N.E.2d at 683.) The spouse charged with dissipation of marital funds has the burden of showing, by clear and convincing evidence, how the marital funds were spent. (*Tietz*, 238 Ill. App. 3d at 983, 605 N.E.2d at 683.) General and vague statements that funds were spent to pay bills or on marital expenses are inadequate to avoid a finding of dissipation. (*Tietz*, 238 Ill. App. 3d at 984, 605 N.E.2d at 683.) The explanation given by the spouse charged with dissipation as to how funds were spent requires the trial court to determine his or her credibility. (*Tietz*, 238 Ill. App. 3d at 983-84, 605 N.E.2d at 683.) A reviewing court should not reverse a trial court's finding of dissipation absent an abuse of discretion. *In re*

*Marriage of Thomas* (1993), 239 Ill. App. 3d 992, 994-95, 608 N.E.2d 585, 587.

Ward seems to argue the trial court erred in failing to state what conduct constituted dissipation and how it arrived at the amount. A trial court is not required to make such a specific statement when finding dissipation. The court had ample evidence on which to base its finding of dissipation: Ward took two expensive trips, ostensibly to maintain his continuing medical education credits, on which he spent nearly $5,000 and lost two weeks of employment; bought his girlfriend a $1,400 ring, spent $500 on music equipment and $1,500 on furniture, while refusing to pay the IRS and claiming insufficient funds to pay his wife's maintenance; continued to sign, and make payments on, leases for thousands of dollars worth of medical equipment, even though his practice was declining; and took a $5,000 cash advance, sold one of the Cadillacs for $2,800, and received $34,000 in cash from a lease, disposing of this money without accounting for it. The trial court had the opportunity to view Ward and assess his credibility, and we find nothing in the record to indicate the court abused its discretion in determining Ward had dissipated marital assets.

■ Ward contends the court erred in its property division and debt allocation. Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d) (West 1992)) requires the trial court to divide the marital property in just proportions. (*Thomas*, 239 Ill. App. 3d at 994, 608 N.E.2d at 587.) It is well settled that just proportions does not necessarily mean mathematically equal shares. (*Thomas*, 239 Ill. App. 3d at 996, 608 N.E.2d at 588; *In re Marriage of Hacker* (1992), 239 Ill. App. 3d 658, 666, 606 N.E.2d 648, 653.) The Act requires a trial court to consider many factors when dividing marital property, including the duration of the marriage, the standard of living established during the marriage, the value of the property awarded to each spouse, the relevant economic circumstances of each spouse, whether the apportionment is in lieu of or in addition to maintenance, and the age, health, occupation, employability, liabilities, sources of income and needs of each party. (*Thomas*, 239 Ill. App. 3d at 996, 608 N.E.2d at 588; *Hacker*, 239 Ill. App. 3d at 666, 606 N.E.2d at 653-54.) When reviewing a distribution of property, an appellate court must not substitute its judgment for that of the trial court absent a clear abuse of discretion. (*Hacker*, 239 Ill. App. 3d at 663, 606 N.E.2d at 651-52; *In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 88-89, 458 N.E.2d 1360, 1362.) An abuse of discretion occurs only where no reasonable person could adopt the trial court's position. *Mullins*, 121 Ill. App. 3d at 88-89, 458 N.E.2d at 1362.

The trial court determined Barbara should not be responsible for the parties' staggering debt, including the over $300,000 debt to the IRS, which included $80,000 in penalties and interest. We think this determination was an abuse of the trial court's discretion. First of all, the court's attempt to shield Barbara from the various creditors was ineffective. The creditors were not parties to the dissolution proceeding and are not bound by the court's order that Ward and not Barbara pay the various debts. Barbara may be able to persuade the IRS that she is an "innocent spouse," but she will have to do that in a proceeding to which the IRS is a party. (See 26 U.S.C. § 6013 (1988); Annot., *Validity, Construction, and Application of Innocent Spouse Statute (26 U.S.C.S. § 6013(e)), Under Which Innocent Spouse is Relieved of Federal Income Tax Liability in Certain Cases*, 31 A.L.R. Fed. 14 (1977).) Second, this case did not in fact involve a property division but a debt division, as the value of the assets was so far exceeded by the amount of the debt. The court's attempt to give Barbara assets which were being pursued by creditors and relieve her of any responsibility for the debt was unrealistic. Barbara is responsible for these debts and should be encouraged to cooperate in their settlement, whether that involves surrender of the assets or Barbara returning to work. The court specifically found Barbara was a party to the irresponsible, overindulgent, and lavish lifestyle established during the marriage. Whether she signed the checks or not, Barbara benefitted from Ward's failure to pay taxes, was aware of the arrearage in taxes, and had a responsibility, along with her husband, to resolve that debt. She could not relieve herself of the duty to impress upon Ward the importance of paying off debts, rather than traveling with her to Europe, merely by saying, "That wasn't our marriage."

Individuals sometimes make decisions during a marriage which result in great profits, and their spouses benefit from those decisions. Other decisions result in great losses, and spouses are harmed. A trial court should not penalize an individual in a dissolution of judgment order for mistaken decisions during a marriage. Only conduct which amounts to dissipation, the use of property for one's sole benefit and for a purpose unrelated to the marriage, may be considered in awarding marital property. Even dissipation may not be considered where it simply occurred during the marriage, and not " 'at a time that the marriage is undergoing an irreconcilable breakdown.' " (*In re Marriage of O'Neill*, 138 Ill. 2d at 497, 563 N.E.2d at 498-99, quoting *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886, 507 N.E.2d 207, 210.) The trial court must enter a new order dividing assets and liabilities more equally between the parties.

■ Ward finally asserts the court erred in awarding Barbara permanent maintenance in the amount of $1,700 per month. The awarding and modification of maintenance rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. (*In re Marriage of Pedersen* (1992), 237 Ill. App. 3d 952, 956, 605 N.E.2d 629, 632; *Carpel*, 232 Ill. App. 3d at 828, 597 N.E.2d at 863.) Maintenance for an indefinite term is appropriate where it is evident the recipient spouse is either unemployable or employable only at an income considerably lower than the standard of living established during the marriage. (*Pedersen*, 237 Ill. App. 3d at 958, 605 N.E.2d at 633-34.) However, even a spouse awarded indefinite maintenance has a good-faith obligation to work toward becoming self-sufficient. (*Pedersen*, 237 Ill. App. 3d at 958, 605 N.E.2d at 634; *In re Marriage of Cheger* (1991), 213 Ill. App. 3d 371, 380, 571 N.E.2d 1135, 1141.) To fulfill this obligation, the recipient spouse must seek and accept appropriate employment. (*In re Marriage of Lenkner* (1993), 241 Ill. App. 3d 15, 23, 608 N.E.2d 897, 903.) The goal of establishing the spouse's financial independence "must be balanced against a realistic appraisal of the likelihood that the spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage" (*Cheger*, 213 Ill. App. 3d at 378, 571 N.E.2d at 1140), and is thus not required in all cases. (*Lenkner*, 241 Ill. App. 3d at 24, 608 N.E.2d at 903-04, citing *In re Marriage of Hensley* (1991), 210 Ill. App. 3d 1043, 1050, 569 N.E.2d 1097, 1101.) The dependent former spouse is entitled to continue to live in some approximation to the standard of living established during the marriage, unless the payor spouse's financial situation indicates otherwise. *Lenkner*, 241 Ill. App. 3d at 25, 608 N.E.2d at 904; see 750 ILCS 5/504(a) (West 1992).

The trial court wisely entered an order of permanent maintenance in this case. The major question here is whether Ward will be able to recover from the problems which have beset him, and an award of maintenance provides the necessary flexibility to provide for Barbara's needs to the extent allowed by Ward's income. Ward challenges the amount of maintenance, $1,700 per month, as excessive but it is difficult to accurately determine the net income of a self-employed individual. Such a determination is one for the trial court. In this case Ward continued to receive substantial amounts as gross income and seemed able to continue living at his prior lifestyle. Substantial questions were raised as to Ward's credibility. The trial court was not required to accept Ward's assertion that he could not afford to pay $1,700-per-month maintenance. We cannot say that the trial court's award of maintenance was improper, although of course

the trial court must now reconsider that award in connection with its new decision on property and debt division. We note again that even a spouse who is entitled to permanent maintenance is required to seek reasonable employment.

Accordingly, we affirm the trial court's refusal to modify its temporary maintenance order, its order finding Ward in contempt and imposing of a 30-day jail sentence for that contempt, and its determination Ward dissipated marital assets. We reverse the trial court's division of the parties' property and debt and remand with instructions to reallocate that property and debt more equitably between the parties. On remand the trial court may make any other changes to its judgment which it deems warranted, including a change to its order of maintenance.

Affirmed in part; reversed in part and remanded.

JUSTICE LUND, specially concurring:

Justice Steigmann's special concurrence suggests the change in section 504 of the Act effective January 1, 1993 (see Pub. Act 87—881, eff. January 1, 1993 (1992 Ill. Laws 1019, 1023-24)), "deprives *Mittra*—and its progeny—of continuing validity." (260 Ill. App. 3d at 835.) He has concluded that since 1977 the legislature has changed from disfavoring maintenance to favoring maintenance. I do not find justification for that conclusion.

What has been intended, and is now intended, is that permanent maintenance be given in proper cases. However, that does not negate an obligation by the maintenance recipient to seek partial or full self-support in proper cases. I need not waste print by repeating what has continually been set forth by our court and others on this subject. (See *Lenkner*, 241 Ill. App. 3d 15, 608 N.E.2d 897.) Three members of our court, including Justice Cook, recognized the validity of *Mittra* in the Lenkner opinion, and I emphasize the same recognition by concurring with Justice Cook's opinion in this case.

Having carefully examined the changes to section 504 since inception through the latest changes, I find no justification for holding *Mittra* no longer has validity.

JUSTICE STEIGMANN, specially concurring:

Although I agree fully with the result and with almost everything the majority says in reaching it, I write specially because the majority opinion purports to breathe life into a doctrine of law I believe no longer valid. Specifically, the majority states that "even a spouse awarded indefinite maintenance has a good-faith obligation to work

toward becoming self-sufficient." (260 Ill. App. 3d at 833.) Further, the majority concludes the opinion by writing, "We note again that even a spouse who is entitled to permanent maintenance is required to seek reasonable employment." (260 Ill. App. 3d at 834.) For the reasons that follow, I disagree with these statements.

In support of the above statements, the majority cites *Pedersen* (237 Ill. App. 3d at 958, 605 N.E.2d at 634), which in turn cites *In re Marriage of Martin* (1992), 223 Ill. App. 3d 855, 860, 585 N.E.2d 1158, 1162. *Martin* states that "[t]he failure to make good-faith efforts to achieve [the goal of becoming financially independent in the future], following a reasonable time frame during which the objective should be accomplished, might form the basis for a petition for modification." (*Martin*, 223 Ill. App. 3d at 860, 585 N.E.2d at 1162.) As authority, *Martin* cites *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 450 N.E.2d 1229, which does support the holding in *Martin*, but was premised upon section 504(b)(2) of the Act (and the committee comments thereto) *as that section then existed.*

This court based its decision in *Mittra* upon the original intent of the Act in 1977, which was to replace maintenance with property division to the extent possible. In 1977, the legislature clearly viewed maintenance with some disfavor, and that disfavor is the source of the *Mittra* rule that "even a spouse awarded indefinite maintenance has a good-faith obligation to work toward becoming self-sufficient." 260 Ill. App. 3d at 833.

Sixteen years later, through its 1993 amendments to the Act, the legislature has made equally clear that it no longer views maintenance with disfavor. Effective January 1, 1993, the legislature gutted section 504 of the Act and rewrote it. (See Pub. Act 87—881, eff. January 1, 1993 (1992 Ill. Laws 1019, 1023-24).) Because this court premised *Mittra* so strongly upon section 504 and its committee comments (see *Mittra*, 114 Ill. App. 3d at 634-35, 450 N.E.2d at 1234), the rewriting of section 504 deprives *Mittra*—and its progeny—of continuing validity. To suggest now, as the majority does, that a spouse receiving permanent maintenance is still required to seek reasonable employment is to treat section 504 of the Act as if the legislature had never revised and rewritten it.

Note specifically that the "old" section 504(b)(2)—the section before Public Act 87—881 amended it—defined the following as a relevant factor: "the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment." (Ill. Rev. Stat. 1991, ch. 40, par. 504(b)(2).) As a result of Public Act 87—881, section 504(b)(2) became section 504(a)(5) and now reads as follows: "the time necessary to enable the party seeking

maintenance to acquire appropriate education, training, and employment, *and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment."* (Emphasis added.) (750 ILCS 5/504(a)(5) (West 1992).) I suggest that one of the changes sought by the legislature with this new language was the elimination of the *Mittra* doctrine that the majority today claims is still good law. Note also that the maintenance order in this case was entered on February 18, 1993, after the effective date of Public Act 87—881.

As a result of the recent amendment to section 504, that section is now neutral regarding what the spouse receiving maintenance *must* do, leaving the matter to the sound judgment and discretion of the trial court. In other words, if the trial judge in this case thinks it appropriate to order respondent, the recipient of permanent maintenance, to seek reasonable employment toward the goal of becoming self-sufficient, then the judge can so order. He does not need us peering over his shoulder, telling him how he should view the issue of maintenance in a case he has spent months adjudicating.