# Illinois Official Reports

## Appellate Court

---

*In re Marriage of Bernay*, 2017 IL App (2d) 160583

---

Appellate Court
Caption

*In re* MARRIAGE OF LYNN D. BERNAY, Petitioner-Appellant, and
JERRY S. BERNAY, Respondent-Appellee.

District & No.

Second District
Docket No. 2-16-0583

Filed
Rehearing denied

July 19, 2017
November 1, 2017

Decision Under
Review

Appeal from the Circuit Court of Lake County, No. 92-D-2420; the
Hon. Joseph V. Salvi, Judge, presiding.

Judgment

Reversed and remanded with directions.

Counsel on
Appeal

Joel S. Ostrow, of Law Offices of Joel Ostrow, of Bannockburn, for
appellant.

Brian A. Schroeder, of Schiller, DuCanto & Fleck LLP, of Chicago,
and Eric L. Schulman, of Schiller, DuCanto & Fleck LLP, of Lake
Forest, for appellee.

Panel

JUSTICE HUTCHINSON delivered the judgment of the court, with
opinion.
Presiding Justice Hudson and Justice Birkett concurred in the
judgment and opinion.

**OPINION**

¶ 1 Petitioner, Lynn D. Bernay, appeals from the judgment of the trial court that terminated monthly maintenance payments from Lynn's former husband, respondent, Jerry S. Bernay. We reverse and remand.

¶ 2 The parties, who are now in their sixties, married in Colorado in April 1978. Shortly after they married, the parties moved from Colorado to Illinois so that Jerry could join his family's business, Rosman Adjustment, a debt-collection agency. With the birth of their first child, the parties agreed that Lynn would be a stay-at-home mother while Jerry would financially provide for the family through his employment at Rosman. The parties intended to return to Colorado upon retiring. Ultimately, the marriage resulted in three children.

¶ 3 The parties separated in September 1992, and Lynn petitioned to dissolve the marriage. At the time, the parties' children were still minors. In January 1993, Lynn enrolled in a nursing program at the College of Lake County. She graduated with an associate's degree and was employed as a nurse. Jerry meanwhile had done well in the family business. During the last three years of the parties' marriage—1992, 1993, and 1994—Jerry's gross income was $118,700, $129,400, and $126,100, respectively.

¶ 4 The parties' dissolution judgment was entered in February 1995. It provided that Jerry would pay Lynn $4150 per month in unallocated maintenance and child support, reviewable after 36 months.

¶ 5 In August 1999, the trial court, Judge Emilio B. Santi, reviewed the maintenance award. The court noted that Lynn had recently become employed as a registered nurse, earning approximately $28,000 annually. Jerry's income, however, was considerably greater. His income from Rosman was $250,000 in 1996, $340,000 in 1997, and $383,000 in 1998. The court increased Lynn's unallocated maintenance and child support to $6000 per month, reviewable after 60 months.

¶ 6 In 2003, Lynn moved to Colorado, where the parties' youngest child would attend college. In 2004, Lynn petitioned for an extension of maintenance. After a three-day trial focused on the parties' finances, in March 2006, the trial court, Judge Diane E. Winter, ordered Jerry to pay Lynn permanent maintenance in the amount of $3600 per month.

¶ 7 The trial court found that Lynn was in her fifties and employed as a nurse, earning approximately $42,000 annually. Lynn had $2100 in a retirement account and $24,000 in a money market account. The court found that Lynn "ha[d] made good faith efforts toward financial independence" but was "employed at an income insufficient to provide for her own support consistent with the standard of living established during the marriage." The court noted that, during the marriage, "the parties enjoyed a comfortable lifestyle, which included travel and vacations, Bulls, Cubs and Blackhawk[s] games, concerts, weekly dinners out with family and friends and owning and maintaining a horse." Lynn's standard of living meanwhile, as a nurse in Colorado, was not as comfortable, and she was unable to make ends meet.

¶ 8 Conversely, the court found that Jerry had substantial income: his average annual salary was $225,000, he earned over $40,000 annually from his investment income, and he received $40,000 in yearly economic benefits from his new marriage. All told, Jerry's investment accounts were worth some $1.6 million, and Jerry had $328,000 in his retirement account. Jerry also owned a home in Buffalo Grove worth $469,000, with $181,000 remaining on the

mortgage. The court found that Jerry had an increased ability to pay maintenance, as Jerry's new wife paid for a number of Jerry's expenses, including his mortgage.

¶ 9 With respect to Lynn, the court noted that her expenses were reasonable and held as follows:

"Lynn was out of the job market for in excess of seventeen (17) years, from 1978 to 1996, devoting her time to domestic duties and foregoing her education. *** Since the separation of the parties, from 1995 through 2003, Lynn resumed completion of her education and re-entered the job market through several part-time jobs and eventually a full-time position in 2000. In 2005, Lynn has an impaired earning capacity resulting from her prior devotion of time to domestic duties, both pre- and post-judgment, due to child rearing in the children's formative years and because of the children's ages and grade levels at the time of the entry of the Judgment for Dissolution. As such, Lynn delayed her education, training, employment, and career opportunities.

* * *

During the marriage Lynn made significant contributions to Jerry's present earning capacity by devoting time to rearing the [parties'] children while Jerry pursued his career. *** Lynn is employed at an income insufficient to provide for her own support consistent with the standard of living established during the marriage. Lynn is unable to meet her needs from her income from employment and has been forced to invade capital in order for her to meet her needs.

* * *

The Court recognizes that the optimal goal of [maintenance] is for the dependent former spouse to become financially independent. However, due to Jerry and Lynn's grossly disparate earnings and earning capacity, this goal is not achievable in light of Lynn's entitlement to maintain the standard of living established during the marriage. Based upon Jerry's economic stability and asset accumulation and Lynn's instability, an award of permanent maintenance is warranted. The court finds that Lynn has achieved stable employment and is currently earning the highest level of income she can be expected to earn. Nothing will be gained by adopting another review period."

With that, the trial court awarded Lynn permanent maintenance, which would terminate only upon either party's death or upon Lynn's remarriage or participation in a conjugal relationship.

¶ 10 Jerry appealed, and, in an unpublished order, we affirmed the judgment of the trial court. See *In re Marriage of Bernay*, No. 2-06-0697 (2007) (unpublished order under Supreme Court Rule 23). With respect to the parties' standard of living during the marriage, our order, based on the record at the time, stated the following:

"In the three years prior to their separation in 1992, the family vacationed in Seattle, San Francisco, St. Thomas, Cozumel, Steamboat Springs, Denver, New York, Miami, and Boca Raton. The parties owned a horse that they boarded with a third party, and petitioner took riding lessons. Additionally, the parties had an interest in season tickets for the Bulls, attended Blackhawks and Cubs games several times each season, had memberships to health clubs, dined out several times a week, hosted parties at their home, and attended concerts, museums, and movies on a regular basis." *Id.* at 3.

¶ 11 In 2014, Jerry petitioned to terminate Lynn's maintenance. In his petition, Jerry alleged that his salary from Rosman, which he now owned exclusively, had decreased and that he

wished to retire within 12 months. In a subsequent filing, Jerry stated that he had since been diagnosed with lymphoma, which he cited as a basis for terminating Lynn's maintenance.

¶ 12    After a hearing, the trial court, now Judge Joseph V. Salvi, granted Jerry's petition to terminate Lynn's maintenance. The court found that there had been a substantial change in circumstances, due to Jerry's illness, his reduced salary, and his imminent retirement. Conversely, the court found that Lynn had failed to make reasonable efforts to become financially self-sufficient. Citing *In re Marriage of Dunseth*, 260 Ill. App. 3d 816 (1994), the court stated that Lynn had failed "to work toward becoming self-sufficient" and to "seek and accept appropriate employment." The court noted that Lynn, who lost her full-time job as a nurse in 2012, had since worked part-time as a nurse at a family practice, earning approximately $27,000 per year, and had received a gift of $12,000 per year from her father (who was 88 years old at the time of the judgment). According to the court, Lynn had "failed" to seek "full[-]time employment including commuting outside of Boulder" and "failed" to obtain "further education or training to advance her career." We will address other aspects of the court's judgment below.

¶ 13    Lynn appeals from the order terminating her maintenance. We review such orders for an abuse of the trial court's discretion, and we will reverse only if the court's determination was arbitrary, fanciful, or unreasonable. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24. Having found an abuse of discretion here, we reverse the trial court's judgment.

¶ 14    The trial court failed to give any deference to Judge Winter's March 2006 order awarding Lynn permanent maintenance, as well as our 2007 order affirming the award. Permanent maintenance is appropriate "where it is evident the recipient spouse is either unemployable or employable only at an income considerably lower than the standard of living established during the marriage." *Dunseth*, 260 Ill. App. 3d at 833. Section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) provides that "[a]n order for maintenance may be modified or terminated only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2016). Thus, unless the parties had agreed otherwise (and here there was no such agreement), the maintenance order was implicitly modifiable upon a showing of a substantial change, regardless of whether the maintenance award was labeled as "permanent." See *Blum v. Koster*, 235 Ill. 2d 21, 42 (2009). Section 510(a-5) further provides an inexhaustive list of factors for trial courts to consider in reviewing maintenance awards, only one of which is the efforts of the party receiving maintenance to become self-supporting. 750 ILCS 5/510(a-5)(2) (West 2016). The burden was on Jerry, as the party seeking the modification, to prove that a substantial change had occurred. See *In re Marriage of Connors*, 303 Ill. App. 3d 219, 226 (1999).

¶ 15    Lynn argues that Judge Winter's award of permanent maintenance was *res judicata*—or the "law of the case"—and that her maintenance cannot be terminated but upon an event prescribed in that order, such as death or remarriage. The argument incorrectly implies that the trial court was precluded from terminating Lynn's maintenance at all. But, as noted, even permanent maintenance may be flexible; thus, the trial court was free to review or terminate maintenance *provided* that there had been a substantial change in circumstances since maintenance had been ordered. See *Blum*, 235 Ill. 2d at 42.

¶ 16    That said, Lynn is correct in one critical respect: the trial court owed at least *some* deference to the prior determinations in this case (*Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 694 (1994))—particularly, as a baseline for understanding the parties'

status quo and for determining whether there had been a substantial change. The trial court apparently took it upon itself to redetermine the parties' standard of living during the marriage. In so doing, the trial court relied solely on a brief, vague statement made by Judge Santi in 1999 concerning the parties' standard of living during the latter part of their marriage—that it "was *not at all ostentatious or grandiose*" (emphasis added by Judge Salvi)—and ignored entirely the more fulsome descriptions contained in Judge Winter's March 2006 order (see *supra* ¶¶ 7-9) and in our 2007 order affirming the award (see *supra* ¶ 10 (quoting *Bernay*, slip order at 3)). The substitution of these findings selectively depressed the parties' standard of living during the marriage and was unreasonable and unnecessary. The court's error contaminated its entire analysis of the issue and was an abuse of discretion.

¶ 17    The evidence presented in this case did not reasonably demonstrate a substantial change in circumstances warranting the termination of Lynn's maintenance. As the trial court noted, "a spouse awarded indefinite maintenance has a good-faith obligation to work toward becoming self-sufficient" and "must seek and accept appropriate employment." *Dunseth*, 260 Ill. App. 3d at 833. However, as the trial court failed to note, a spouse is entitled to maintain a "reasonable approximation of the standard of living established during the marriage." *Id.* Where former spouses have grossly disparate earning potentials, financial self-sufficiency—which is just one of a number of statutory factors that the court should consider—might not be required. *Id.* (citing *In re Marriage of Lenkner*, 241 Ill. App. 3d 15, 24-25 (1993)); see *Heroy*, 2017 IL 120205, ¶ 28. Accordingly, a former spouse is not " 'required to lower the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet his needs and the needs of his former spouse.' " *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 87 (quoting *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1044 (2008)).

¶ 18    Here, as the party seeking to terminate maintenance, Jerry was required to show that a substantial change in circumstances had occurred—namely, either that Lynn's financial needs had significantly decreased or that Jerry was no longer able to pay Lynn's maintenance. See *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 198 (2011). That high burden was not met here. The trial court's principal basis for terminating Lynn's maintenance was Jerry's claim that he planned to retire from Rosman in November 2016. That was not a substantial change at all. When the trial court awarded permanent maintenance in 2006, the parties were both in their *mid-fifties*. Jerry was in the middle of his career, and Lynn had only just started hers. The parties' finances and not-too-distant retirement plans were *directly* at issue. In other words, Jerry's retirement was clearly contemplated when permanent maintenance was ordered. It is axiomatic that, to warrant termination, the "change" must not have been contemplated when permanent maintenance was ordered. See *In re Marriage of Virdi*, 2014 IL App (3d) 130561, ¶ 30; *In re Marriage of Reynard*, 378 Ill. App. 3d 997, 1005 (2008) ("we are reluctant to find a 'substantial change in circumstances' where the trial court contemplated and expected the financial change at issue"). Given the history of this case before the trial court and this court, Jerry's 2016 retirement—an eventuality anticipated in 2006—did not constitute a substantial change.

¶ 19    Moreover, the evidence demonstrated that Jerry had sufficient assets to continue to satisfy his maintenance obligation. The trial court found that Jerry's real estate portfolio is worth approximately $1.1 million, which included the five-bedroom home in Buffalo Grove, a three-bedroom home in Sanibel, Florida, and a condo in downtown Chicago. Jerry has approximately $1.4 million in his retirement accounts. And Jerry expects to inherit

approximately $1.9 million from the estates of his recently deceased parents, funds he can use to meet his needs in retirement. The trial court noted that Jerry's 2015 salary, or "W-2 income," from Rosman was $145,000. True, this represents a decrease in Jerry's salary from its earlier heights, but nothing indicates that Jerry's 2015 salary or his retirement income is insufficient to meet his maintenance obligation. We note, too, that Jerry testified that, as Rosman's sole owner, he set his own salary and can sell the business at any time, provided that he finds a purchaser. Although the value of the business is not evident, in 2014 Rosman had seven full-time employees in addition to Jerry and its gross receipts were approximately $600,000.

¶ 20    Jerry's lymphoma diagnosis likewise does not indicate a substantial change. Jerry offered no evidence that his treatment would impact, let alone deplete, his financial resources. Jerry stated that he had not undergone radiation or chemotherapy treatment. He takes medication for his condition and sees a doctor every two or three months. While we hope that Jerry's condition remains stable and manageable, without more we cannot say that his condition negates his ability to meet his maintenance obligation.

¶ 21    An award of permanent maintenance should not be lightly terminated. As has been said:

> "Marriage is a partnership, not only morally but financially. Spouses are coequals and homemaker services must be recognized as significant when the economic incidents of divorce are determined. The former homemaker should not be penalized for having performed his or her assignment under the agreed-upon division of labor within the family. It is inequitable upon dissolution to saddle the former homemaker with the burden of his or her reduced earning potential and to allow the wage-earning former spouse to continue in the advantageous position he or she reached through *their joint efforts*." (Emphasis added.) *Lenkner*, 241 Ill. App. 3d at 25.

Although Jerry's petition to terminate suggested a reduction in maintenance as an alternative remedy, Jerry eschewed that alternative and pursued an all-or-nothing approach to termination at the hearing before the trial court. With that in mind, we determine that the trial court did not hold Jerry to his burden of demonstrating a substantial change and that it abused its discretion in terminating maintenance. In particular, the trial court's assessment of Lynn's finances appears both harsh and unrealistic. The trial court chided Lynn for working only part-time—20 hours a week, earning $26,749 annually—and speculated that she could earn "as much as $51,896 (earning her current rate of pay on a 40 hours [*sic*] work week)." Nothing in Judge Winter's 2006 judgment *required* Lynn to obtain full-time employment *at all*. And, further, even if it were assumed that Lynn had such an obligation to work full-time, and reasonably could obtain such employment, that amount would be insufficient to provide Lynn with the lifestyle described in both the trial court's 2006 judgment and our 2007 order affirming that judgment.

¶ 22    Three additional aspects of the trial court's decision are also troubling. First, the court found that Lynn's efforts to secure full-time employment were insufficient because she failed "to further [her] education or training to advance her career (e.g. physician's assistant)" and should have "commut[ed] outside of Boulder" to seek full-time employment. Again, nothing in the 2006 judgment imposed such requirements. Second, the court stated that, since Lynn had turned 62, she was eligible to receive Social Security. The implication was that Lynn *should have* drawn on her Social Security. But the court neglected to consider that, as a practical matter, Lynn's hypothetical Social Security benefits would be greatly reduced because the full retirement age under Social Security is 66 for those in her age group. Moreover, Lynn's

hypothetical benefits would be dramatically reduced if she obtained full-time employment as the court insisted. See https://www.ssa.gov/ planners/retire/1937.html (last visited June 27, 2017). That said, as a legal matter, however, we know of no authority that requires a former spouse to draw on retirement benefits at the earliest opportunity, regardless of the penalties, as a precondition to continue to receive *permanent* maintenance. *Cf. In re Marriage of Mueller*, 2015 IL 117876, ¶ 26 (explaining that calculations based on "hypothetical Social Security benefits" that a former spouse might "not ever receive is both illogical and inequitable"). Finally, the court noted that Lynn had occasionally rented out a bedroom in her Colorado home for several hundred dollars a month to a coworker and later to a friend. The available evidence showed that these were casual arrangements at best, yet the court's order implied that Lynn had some sort of continuing obligation to earn rental income from her property. We know of no authority that would support the court's position.

¶ 23    A petition to modify or terminate maintenance does not permit a court to revisit and determine the entirety of the parties' finances *de novo*. Prior judicial determinations are the best evidence of what is expected of the parties. The conditions for Lynn to continue to receive permanent maintenance were spelled out in Judge Winter's 2006 order. The trial court gave no meaningful deference to the prior determinations in this case; it added its own conditions *post hoc* and terminated Lynn's maintenance in light of those new conditions. That was a clear abuse of the court's discretion. We remind the court that a recipient of permanent maintenance is entitled to maintain " 'the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet his needs and the needs of his former spouse.' " *Shen*, 2015 IL App (1st) 130733, ¶ 87 (quoting *Walker*, 386 Ill. App. 3d at 1044). The evidence showed that Jerry had such assets. Accordingly, Lynn's maintenance should not have been terminated.

¶ 24    The judgment of the circuit court of Lake County is hereby reversed, and we remand this cause for the court to calculate any arrearage under the 2006 maintenance order.

¶ 25    Reversed and remanded with directions.