# Illinois Official Reports

## Appellate Court

---

**In re Marriage of Brunke, 2019 IL App (2d) 190201**

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF JUDITH E. BRUNKE, Petitioner-Appellee and Cross-Appellant, and JOHN W. BRUNKE, Respondent-Appellant and Cross-Appellee. |
| District & No. | Second District<br>No. 2-19-0201 |
| Filed | December 24, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 12-D-387; the Hon. Joseph M. Grady, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Philip J. Piscopo and Stephen M. Cooper, of Law Offices of Cooper, Storm & Piscopo, of Geneva, for appellant.<br><br>Matthew G. Shaw and Deidre C. Sanders, of Shaw Family Law, P.C., of St. Charles, for appellee. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices McLaren and Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1     Respondent, John W. Brunke, appeals an order of the circuit court of Kane County extending maintenance awarded to petitioner, Judith E. Brunke. Judith cross-appeals that part of the same order denying her petition to increase maintenance. We affirm.

## I. BACKGROUND

¶ 2

¶ 3     The following facts are adequate for an understanding of the issues. Where necessary, the facts will be supplemented in the Analysis section of this opinion. The parties were married on February 1, 1986. No children were born to or adopted by the parties during the marriage. The judgment for dissolution of marriage (JDOM) was entered on April 30, 2012. Judith was 62 years of age, and John was 53. During the divorce proceedings, Judith was *pro se*, while John was represented by counsel. The parties entered into a marital settlement agreement that provided that John would pay Judith maintenance of $3000 per month for five years, after which maintenance was reviewable. That agreement was incorporated into the JDOM.

¶ 4     On January 5, 2017, Judith filed both a "Petition to Review/Extend Maintenance" and a "Petition to Modify (Increase) Maintenance." The petition to review/extend maintenance alleged that Judith was presently unemployed and that John, who was employed by American Airlines, received a promotion and earned substantially more income than he did when the JDOM was entered. The petition further alleged that (1) the original maintenance award was inequitable, (2) $3000 per month in maintenance was insufficient for Judith to support herself, (3) she had expended savings to meet her monthly expenses, and (4) she had made efforts to become self-supporting. Judith requested permanent maintenance. Judith's allegations in the petition to increase maintenance were substantially identical. Specifically, Judith alleged that John's promotion and increased income since the divorce were a substantial change in circumstances. John filed responses denying that Judith was entitled to the relief she requested.

¶ 5     On March 7, 2017, John filed a "Motion to Abate Maintenance Obligation," in which he requested that maintenance be abated pending trial.[1] John noticed that motion for hearing on March 16, 2017. John then filed a second, identical "Motion to Abate Maintenance Obligation" on March 15, 2017. That motion was also noticed for hearing on March 16 and was denied on May 17, 2017. On June 23, 2017, John filed a third motion to abate maintenance. The court continued that motion to the trial on Judith's petitions.

¶ 6     At trial, which occurred over four days in August and September 2018, the parties stipulated to the following facts. Judith was 68 years of age, and John was 59. Judith was awarded the marital residence, which was worth $395,000 when the JDOM was entered, as well as monetary assets totaling approximately $842,000 at that time. Judith's brokerage accounts were worth $897,030.34 as of December 31, 2017. Judith's real estate taxes and homeowner association fees totaled $9864 per year, she would receive $482 per month in Social Security benefits if she were to take them, she received $1761 per month from a certain "A" fund, she paid approximately $9000 in income taxes for the years 2016 and 2017, and she earned $5893.46 working at Target in 2017.

---

[1]John's concern was that time-consuming discovery squabbles were lengthening his maintenance obligation beyond the date that it would have terminated under the JDOM.

¶ 7        The parties then stipulated that John's income was $362,000 per year, he had $120,000 in a combined checking and savings account, his individual retirement account was worth $1,276,931.37, and his brokerage accounts totaled $188,208.33. In addition, the equity in John's home was $108,515, his vehicles were worth $39,000, and his airplane and hangar were worth approximately $150,000.

¶ 8        Judith testified as follows. After the divorce, she waited 2½ years to seek employment. She was "gobsmacked" by the divorce, and it took her "a very, very long time to work through" getting her life in order. Eventually, she applied for retail jobs but was turned down because she was too old. Then, in 2015, Target hired her.

¶ 9        Judith was currently employed at Target, making $12 per hour. She usually worked 16 to 20 hours per week. Her pay stubs for a certain period in 2017 reflected that she worked fewer hours. She did not seek additional employment to supplement her income. Judith paid Medicare $135 per month. She also paid $157.12 per month for a supplemental insurance policy and $24.10 per month for a drug prescription policy.

¶ 10       Judith had a bachelor's degree and a master's degree in education. She taught for 11 years in Virginia and Kentucky before moving to Illinois in 1985. Because Illinois did not recognize her teaching certificate from Kentucky, she would have had to complete another three years of education to be eligible to teach in Illinois. Rather than do that, she took a job as a college admissions counselor, making approximately $21,000 per year. She stayed in that job for two years and then moved to another college, also for two years. She was terminated from that job and did not work again until she volunteered at a hospital in 2009 or 2010.

¶ 11       According to Judith, she and John traveled "all the time" during the marriage—to all 50 states, Europe, the Caribbean, and the Bahamas. Judith planned all the trips. She had no budget. She testified: "As long as the bills were paid and there was money in the bank, I had pretty much free rein." According to Judith, they also entertained "all the time." She testified that "we were known for our parties." She had no spending limits.

¶ 12       Judith thought that Matthew Williams, John's divorce attorney, represented them both, based on conversations that she had with John and Williams. John had sent Judith an e-mail stating that "we" had paid Williams a retainer. According to Judith, in March 2012, John told her that he would pay her more maintenance if he received a pay raise. Subsequently, when his pay was increased, John gave her an extra $120 per month. However, when his pay was increased again and she asked for more money, John said that Williams told him that he did not have to increase her maintenance.

¶ 13       Judith testified that her lifestyle after the divorce was "not even close" to what she enjoyed during the marriage. She could not afford to travel or give parties. She used to have her hair done every three weeks, and now she had it done every five weeks. She dipped into capital to pay taxes and for home improvements. When John's maintenance payments were late, she used her retirement funds. Judith described her finances as "extremely finite." According to Judith, she depleted some of her assets to pay her current expenses, including attorney fees.

¶ 14       On cross-examination, Judith testified that she was "under duress" when she signed the marital settlement agreement. She disputed that her current assets were worth $1.4 million. She testified that she had $1.2 million in addition to the house. According to Judith's financial affidavit dated July 2018, she had $2075 per month in income and $6700 per month in expenses. Those claimed expenses included $2000 per month for groceries for herself and $1200 per month for home repairs. Judith declared income of $79,269 on her 2017 tax return.

Judith testified that she was not aware that the maintenance award required her to search for a job immediately after the divorce. Judith also testified that she continued to travel after the divorce. She testified that she visits Florida and Washington D.C., although her expenses for travel to Washington are reimbursed by the person whom she visits there. Judith also traveled to England twice after the divorce. According to her financial affidavit, she spends $700 per month on vacations, dining out, and entertainment.

¶ 15 Next, John called Williams, who testified that he represented only John in the divorce. Williams believed that Judith was represented by counsel "early on." According to Williams, he never had a telephone conversation with Judith, nor did he ever exchange e-mails with her. Williams testified that his practice was not to communicate with *pro se* litigants. He stated that his contract with John clearly stated that he represented only John, and the marital settlement agreement also stated that he represented John and not Judith. Williams testified that John was "very clear" that "it was to be a 50/50 division of the estate."

¶ 16 Next, Judith called John as an adverse witness. John testified as follows. When the parties divorced, he was earning $182,000 per year as an American Airlines pilot, and Judith was unemployed outside the home, although she began an eBay business. After the divorce, John underwent additional training to fly the Boeing 787, and his pay substantially increased. In 1990, when Judith expressed interest in becoming a nurse, John offered to send her to school, but Judith did not follow through.

¶ 17 John denied that the parties traveled extensively during the marriage. He testified that they visited "quite a few" states and that they traveled to England 10 times and to Italy once. John agreed that they also traveled to Canada and the Bahamas. They visited his mother in New York and Judith's son in Colorado. He testified that the costs for those trips were "nominal" because of his position with the airline. John testified that he did not give Judith a household budget. The marital residence, where Judith still resided, was 2900 square feet and had four bedrooms and a three-car garage.

¶ 18 John testified that Judith requested $3000 per month in maintenance, "based on her needs." According to John, he had discussed with Judith increasing her maintenance if his salary increased, "while we were getting along quite well." They stopped communicating in 2013 or 2014, and John stopped paying extra maintenance in January 2017.

¶ 19 John testified that they did not spend $2000 per month on groceries while they were married. He described their parties as "comfortable" but not "lavish." In 2001, after September 11, his pay decreased. In 2011, American Airlines went bankrupt, and John lost $1 million in retirement savings. Around 2005, John had heart surgery and now must complete two yearly physicals to be certified to fly. According to John, American Airlines' mandatory retirement age is 65.

¶ 20 On February 20, 2019, the court entered a seven-page handwritten order. It recited that the matters before it were Judith's petitions to extend and increase maintenance and John's "Petition to Terminate and Abate Maintenance" filed on March 15, 2017. The court found that (1) the marital settlement agreement was "fair to the parties under their circumstances then and now"; (2) Judith did "little if anything to gain employment or improve her employability since the divorce" but, due to her age, "it was foreseeable [to the parties] that [Judith] might not have been able to obtain employment by which to attain significantly greater income than she earned during the marriage"; (3) Judith was enjoying the lifestyle that she had during the marriage; and (4) it "appears equitable" to allow Judith to wait until age 70 to draw her Social Security

benefits "without depriving her" of maintenance. Thus, the court granted Judith's petition to extend maintenance but denied her petition to increase maintenance. The court also denied John's "petition to terminate or abate maintenance," ordering him to continue to pay Judith $3000 per month until he retires, at which time maintenance will terminate. John filed a timely notice of appeal, and Judith filed a timely cross-appeal.

¶ 21                                    II. ANALYSIS

¶ 22    Initially, we must sort out which orders are before us. As we shall demonstrate, the orders specified in John's notice of appeal are moot and thus beyond our jurisdiction. Even though neither party raises the issue, we have an independent duty to consider our jurisdiction. *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 24.

¶ 23    John's notice of appeal specified the following orders: (1) the February 20, 2019, order "denying [John's] Petition to Terminate or Abate Maintenance"; (2) the May 17, 2017, order denying John's March 15, 2017, motion to abate maintenance; and (3) the August 15, 2017, order that John alleges "declined to abate [his] maintenance obligation pending hearing of this cause." The record shows that John filed three motions to "abate" maintenance. The first was filed on March 7, 2017, the second was filed on March 15, 2017, and the third was filed on June 23, 2017. The March 7 and the March 15 motions were identical. However, the allegations in the June 23 motion differed from those in the other two. The parties and the court referred to the March 15 and June 23 motions as the first and second motions. Because the March 7 motion was identical to the March 15 motion, we construe the March 15 motion as having superseded the March 7 motion. The March 15 motion was denied on May 17, 2017. The June 23 motion was continued to trial in a "status order" of August 15, 2017. In none of those motions did John request that maintenance be terminated. He asked only that it be abated pending the outcome of the trial.

¶ 24    In its order of February 20, 2019, the court stated that John's motion to "terminate" or abate maintenance filed on March 15, 2017, was before it. Thus, the court's order is erroneous in two respects: (1) John did not move to terminate maintenance, and (2) because the court denied the March 15, 2017, motion to abate on May 17, 2017, that motion was not before it. The June 23, 2017, motion to abate was before the court. However, when the court proceeded to trial without having first ruled on the motion to abate maintenance pending trial, the motion to abate became moot. An issue is moot where events occur that make it impossible for a court to grant effectual relief. *Wheatley v. Board of Education of Township High School District 205*, 99 Ill. 2d 481, 484-85 (1984). The point of John's request to abate maintenance pending trial was to halt his interim maintenance payments. By the time of trial, he had already been obligated to make those payments. Thus, the court's orders declining to abate maintenance, which John specifies in his notice of appeal, are moot.

¶ 25    The only parts of the February 20, 2019, order that would properly be before this court are those granting Judith's petition to extend maintenance and denying her petition to increase maintenance. However, John did not specify that he was appealing that part of the order extending maintenance. This court does not acquire jurisdiction to review judgments or parts thereof that are not specified in a notice of appeal. *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 50. Nevertheless, we liberally construe John's notice of appeal to be from that part of the order extending maintenance. See *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 689 (1994) (notice of appeal is to be liberally construed when determining what

matters were properly raised in the notice, and a defect will be deemed one of form unless that construction prejudices the appellee). Here, Judith is not prejudiced because she addresses in her brief the court's decision to extend maintenance.

¶ 26                                    A. John's Appeal

¶ 27    John contends that the court abused its discretion in extending maintenance because (1) Judith failed to take any steps to become self-sufficient and (2) her assets and income alone are more than adequate to sustain the lifestyle that she enjoyed during the marriage.

¶ 28    Important to our disposition, this matter was before the trial court on review of the maintenance award in the JDOM. A review proceeding results from a court order that specifically provides for a review of that order. *In re Marriage of Heasley*, 2014 IL App (2d) 130937, ¶ 25. Here, the JDOM incorporated the parties' marital settlement agreement, which provided that John would pay $3000 per month for five years. At the end of five years, maintenance was reviewable. The only condition for review was that Judith file and properly serve a petition to review maintenance, "prior to the expiration of 60 months subsequent to entry of judgment." The marital settlement agreement did not specify that the maintenance was rehabilitative.

¶ 29    At the divorce prove-up, John testified that the maintenance was "rehabilitative." Generally, "rehabilitative" maintenance requires a continuing effort by the recipient spouse to become self-sufficient. *In re Marriage of Courtright*, 229 Ill. App. 3d 1089, 1091 (1992). In her "petition to review/extend maintenance," Judith alleged that she made such efforts but that she needed continued maintenance to support herself. Thus, Judith essentially agreed that the maintenance awarded was rehabilitative.

¶ 30    In reviewing a maintenance award, the court considers the factors enumerated in section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(a) (West 2018)): (1) the income and property of each party, (2) the respective needs of the parties, (3) the present and future earning capacity of the parties, (4) any impairment to the parties' present or future earning capacity resulting from domestic duties or delayed education or employment opportunities due to the marriage, (5) the time necessary for the party seeking maintenance to acquire the necessary education or training, (6) the standard of living during the marriage, (7) the duration of the marriage, (8) the age and physical and emotional condition of the parties, (9) the tax consequences of the property division, (10) the contributions of the party seeking maintenance to the education and career of the other spouse, (11) the valid agreement of the parties, and (12) any other factor that the court expressly finds to be just and equitable.

¶ 31    The court also has to consider the factors enumerated in section 510(a-5) of the Act (750 ILCS 5/510(a-5) (West 2018)): (1) any change in the employment status of either party and whether the change has been made in good faith, (2) the efforts, if any, made by the maintenance recipient to become self-supporting, (3) any impairment of the present and future earning capacity of either party, (4) the tax consequences of the maintenance payments upon the respective circumstances of the parties, (5) the duration of the maintenance payments relative to the length of the marriage, (6) the property, including retirement benefits, awarded to each party in the divorce, (7) the parties' increase or decrease in income since the divorce, (8) the property acquired and currently owned by each party after the divorce, and (9) any other factor that the court expressly finds to be just and equitable.

¶ 32 Maintenance awards are within a trial court's sound discretion, and this court will not disturb such an award absent an abuse of that discretion. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 650 (2008). An abuse of discretion exists only where no reasonable person would take the view adopted by the trial court. *Heroy*, 385 Ill. App. 3d at 651. It is the burden of the party challenging the maintenance award to show an abuse of discretion. *Heroy*, 385 Ill. App. 3d at 651. John focuses on two factors: (1) Judith's efforts to become self-sufficient and (2) the property that she acquired in the divorce.

¶ 33                                      1. Judith's Efforts Toward Self-Sufficiency

¶ 34 "When one seeks to extend an award of rehabilitative maintenance, the burden lies on the party seeking the extension to show he or she has met the affirmative duty of acquiring sufficient training or education to find employment." *Courtright*, 229 Ill. App. 3d at 1091. If the party seeking maintenance fails to make a good-faith effort to become self-sufficient, the court may terminate rehabilitative maintenance. *Courtright*, 229 Ill. App. 3d at 1091.

¶ 35 John emphasizes the trial court's findings with regard to Judith's efforts to become self-sufficient: (1) Judith had "done little if anything" to gain employment or to improve her employability since the divorce, and (2) Judith had "taken no significant steps and made little if any effort to become employed at any level" above what she had attained at the time of the divorce. However, the court also found that the parties foresaw "that [Judith] might not have been able to obtain employment" to earn significantly greater income, because of her age. Judith was 62 when the parties divorced, and she was 68 by the time of trial.

¶ 36 John relies on *In re Marriage of Cantrell*, 314 Ill. App. 3d 623 (2000), for his argument that Judith's underemployment should result in termination of maintenance. In *Cantrell*, this court held that awarding permanent maintenance upon review was an abuse of discretion where the former wife was employable, obtained a degree after the divorce, and had no impairments but did "little toward finding gainful employment or advancing her efforts at becoming self-sufficient." *Cantrell*, 314 Ill. App. 3d at 630. While *Cantrell* did not note the former wife's age, it is evident from the context that she was not of advancing years. John's arguments that Judith could have pursued a teaching license in Illinois or gone into nursing are not realistic. There was no legal requirement that she do so during the marriage. Nor did her economic circumstances during the marriage dictate that she pursue a career. Then, when the marriage ended, she was in her sixties. Consequently, *Cantrell* is inapposite.

¶ 37 The trial court is in a better position than this court to assess whether a maintenance recipient will realistically be able to fully or partially support him or herself through employment with the standard of living established during the marriage. *In re Marriage of Gunn*, 233 Ill. App. 3d 165, 179 (1992). Judith testified that she had difficulty finding a job even in retail because of her age, and the trial court was entitled to credit that testimony.

¶ 38                                      2. Judith's Assets Acquired in the Divorce

¶ 39 John asserts that Judith's financial resources preclude any continued need for maintenance. The purpose of the Act is to make the division of marital property the primary means of providing for the financial needs of the parties. *In re Marriage of Brackett*, 309 Ill. App. 3d 329, 338 (1999). Thus, the Act "implicitly provides" for an award of property in lieu of maintenance. *Brackett*, 309 Ill. App. 3d at 338. However, the court may also award both property and maintenance. *In re Marriage of Gan*, 83 Ill. App. 3d 265, 271 (1980).

Maintenance may be awarded only if the recipient spouse lacks sufficient property, including marital property apportioned to him or her in the divorce, to provide for his or her reasonable needs, is unable to support him or herself through appropriate employment, or is otherwise without sufficient income. *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 970 (1992). We keep in mind that the policy underlying maintenance is that the spouse "be enabled to enjoy a standard of living commensurate with that during the marriage." *Schuster*, 224 Ill. App. 3d at 970.

¶ 40    John argues that Judith left the marriage with assets worth $1.2 million, which appreciated to $1.4 million by the time of trial. Judith disputed the $1.4 million figure, but she testified that she had $1.2 million in addition to the house, which was valued at $395,000 in 2012. Judith testified that she depleted her assets to support herself. John argues that the record belies this claim.

¶ 41    First, John points out that Judith reported gross income of $79,052 on her 2017 tax return. Second, John notes that Judith was awarded the marital residence, worth $395,000, lien-free. Third, John notes that Judith claimed that she withdrew $92,000 per year for over five years from an investment account but that the account increased in value. Fourth, John argues that Judith could draw full Social Security benefits of $482 per month but refused to take them until she turned 70 years of age. Fifth, John argues that Judith has access to funds from two substantial retirement accounts worth over $600,000 that she refuses to touch until she reaches age 100. Sixth, John points to Judith's "inflated" expenses of $2000 per month for groceries for just herself and over $14,000 per year for household repairs. John thus concludes that Judith can maintain the lifestyle that the parties established during the marriage without maintenance.

¶ 42    With respect to Social Security benefits, the court stated: "It appears equitable to permit [Judith] to draw those benefits at the highest amount to which she might be entitled, possibly age 70, without depriving her of the income provided her by [the maintenance award]." John argues that Judith's benefits would not substantially increase, as she was willing to work for minimum wage and a minimum of hours per week. In *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 22, this court found "troubling" the trial court's suggestion that the wife should have drawn her Social Security benefits at a lower amount. John attempts to distinguish *Bernay* by asserting that Judith became entitled to full Social Security benefits at age 66. However, John ignores that we further opined in *Bernay* that "we know of no authority that requires a former spouse to draw on retirement benefits at the earliest opportunity, regardless of the penalties" as a precondition to continue to receive maintenance. *Bernay*, 2017 IL App (2d) 160583, ¶ 22.

¶ 43    We hold that the court did not abuse its discretion in extending Judith's maintenance until John retires. He was 59 years old at the time of trial, and American Airlines' mandatory retirement age for pilots is 65. We also note that John's health was such that it required him to pass frequent physicals to keep flying. It is true that Judith did not seek employment for 2½ years after the divorce. However, she was never informed, either in the JDOM or by the court at the prove-up, that she had a duty to seek training or education to continue receiving maintenance. Further, under circumstances involving former spouses with grossly disparate earning potentials, the goal of financial independence for the spouse receiving maintenance is often not realistic or achievable. *In re Marriage of Lenkner*, 241 Ill. App. 3d 15, 25 (1993). At age 62 when the marriage ended, Judith would never have been able to support herself in the lifestyle afforded by John's airline salary.

¶ 44    Nevertheless, we cannot say that the court abused its discretion, as Judith suggests, in refusing to award permanent maintenance. In *In re Marriage of Smith*, 2012 IL App (2d) 110522, ¶ 50, this court held that permanent maintenance to the former husband was not warranted where he was awarded substantial assets in the divorce. Here, Judith admitted that she had $1.2 million in assets in addition to the lien-free marital residence that was worth $395,000 in 2012.

¶ 45                                    B. Judith's Cross-Appeal

¶ 46    Judith asserts that the court abused its discretion in failing to apply the guidelines regarding maintenance set forth in section 504 of the Act. Applying those guidelines, Judith argues that she is entitled to $8507 per month indefinitely or for a period equal to the length of the marriage, based on John's current income of $390,000 per year.[2]

¶ 47    When the JDOM was entered, the 2012 version of section 504 applied. Under that version, the court considered the factors set forth in section 504(a) to determine the amount and duration of maintenance (750 ILCS 5/504(a) (West 2012)). Section 510(a-5) of the Act provided that, in proceedings to review, modify, or terminate maintenance, the court also consider the factors enumerated in that section. 750 ILCS 5/510(a-5) (West 2012). However, as of January 1, 2015, the legislature added to section 504 subsections (b-1) and (b-2), which set guidelines to calculate the amount and duration of maintenance. Pub. Act 98-961, § 5 (eff. Jan. 1, 2015) (amending 750 ILCS 5/504). Under what we refer to as the "guideline" version, the court considers the section 504(a) factors only to determine whether to grant maintenance. 750 ILCS 5/504(a) (West 2016).

¶ 48    The legislature again comprehensively amended the Act in Public Act 99-90, which was effective January 1, 2016. *In re Marriage of Benink*, 2018 IL App (2d) 170175, ¶ 12. Pertinent here, the 2016 revision retained the guidelines. Section 801(c) (750 ILCS 5/801(c) (West 2016)) applied the 2016 revision to "proceedings *** that sought 'the modification of a judgment or order entered prior to' that date." *Benink*, 2018 IL App (2d) 170175, ¶ 12 (quoting Pub. Act 99-90 (eff. Jan. 1, 2016)).

¶ 49    Here, the JDOM was entered before the effective date of the guideline version. The guidelines and amended section 801(c), however, were part of the statute on January 5, 2017, when Judith filed her petitions to extend/review maintenance and to increase maintenance. In her written closing argument, Judith argued that the guidelines applied. The court found that no increase was warranted, because Judith could maintain the lifestyle that she enjoyed during the marriage. The court did not apply the guidelines, nor did it explain its reasons for not applying them. The questions before this court are (1) whether the guidelines apply to review proceedings and (2) whether Judith's petition for increased maintenance, which alleged a change in circumstances, triggered a modification proceeding requiring the application of the guidelines, pursuant to our decision in *In re Marriage of Carstens*, 2018 IL App (2d) 170183.

¶ 50                    1. Application of the Guidelines to Review Proceedings

¶ 51    We again emphasize that the present matter arose on review of the maintenance award. A review proceeding results from a court order that specifically provides for review of that order.

_____

[2]At trial, the parties stipulated that John's income was $362,000. In her closing argument, Judith calculated the amount due under the guidelines based on John's salary of "$358,309.05."

*Heasley*, 2014 IL App (2d) 130937, ¶ 25. Where there is no provision for review, a motion to reconsider maintenance initiates a modification proceeding rather than a review proceeding. *Heasley*, 2014 IL App (2d) 130937, ¶ 26. In a modification proceeding, maintenance will not be altered absent proof of a substantial change in circumstances. *Heasley*, 2014 IL App (2d) 130937, ¶ 26. Proof of a change in circumstances is not required in a review proceeding. *Heasley*, 2014 IL App (2d) 130937, ¶ 26.

¶ 52        In *Carstens*, which was a modification proceeding, this court considered whether the guidelines applied to a 2011 judgment. *Carstens*, 2018 IL App (2d) 170183, ¶¶ 9, 20. We held that section 801(c) of the Act, as amended in 2016, applied the guidelines to *modification* proceedings filed after January 1, 2016. *Carstens*, 2018 IL App (2d) 170183, ¶ 29. Our decision was based on the language of amended section 801(c): "This Act applies to all proceedings commenced after its effective date for the *modification* of a judgment or order entered prior to the effective date of this Act." (Emphasis added and internal quotation marks omitted.) *Carstens*, 2018 IL App (2d) 170183, ¶ 29. We followed our earlier decision in *Benink*, 2018 IL App (2d) 170175, ¶ 29, which was also a modification proceeding. In *Benink*, we held that amended section 801(c) applied only to "*modification* proceedings commenced after January 1, 2016." (Emphasis added.) *Benink*, 2018 IL App (2d) 170175, ¶ 29. The question is whether the holdings in *Benink* and *Carstens* extend to review proceedings.

¶ 53        We do not read the word "modification" as used in amended section 801(c) to include review proceedings, because, in section 510(a-5) of the Act, the legislature distinguished between the two types of proceedings. See *Heasley*, 2014 IL App (2d) 130937, ¶ 25. The first sentence of subsection (a-5) states that an order for maintenance may be "modified or terminated" only upon a showing of a substantial change in circumstances (750 ILCS 5/510(a-5) (West 2018)), while the last sentence of that subsection specifically refers to "review" proceedings.

¶ 54        This court explored that dichotomy in *In re Marriage of Golden*, 358 Ill. App. 3d 464 (2005). In *Golden*, the former wife was awarded $1300 per month in maintenance for three years, after which it was to be reviewed. *Golden*, 358 Ill. App. 3d at 466. Upon review, the trial court reduced the amount to $800 per month but made the maintenance permanent. *Golden*, 358 Ill. App. 3d at 466. In so ruling, the court found that the former husband did not have to prove a substantial change in circumstances. *Golden*, 358 Ill. App. 3d at 466. The former wife appealed, contending that section 510(a-5) required a showing of a substantial change in circumstances in a review proceeding. *Golden*, 358 Ill. App. 3d at 466. To resolve the question, this court first had to determine "whether review is different from modification." *Golden*, 358 Ill. App. 3d at 468.

¶ 55        We noted that the first sentence of section 510(a-5) speaks to modification or termination of maintenance where there was no provision allowing for review. *Golden*, 358 Ill. App. 3d at 468. We then observed that trial courts also conduct review hearings and that they differ from modification hearings in that they "[circumvent] the substantial-change-in-circumstances requirement" of section 510(a-5). *Golden*, 358 Ill. App. 3d at 469. Acknowledging that prior decisions of the appellate court had drawn such a distinction, this court held that section 510(a-5) does not require a showing of a substantial change in circumstances in a review hearing. *Golden*, 358 Ill. App. 3d at 472. Thus, we concluded that "review proceedings and modification proceedings are separate and distinct mechanisms by which reconsideration of maintenance can occur." *Golden*, 358 Ill. App. 3d at 469.

¶ 56    In *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009), our supreme court applied this distinction, citing *Golden*. We believe that the distinction is significant. The two types of proceedings are not interchangeable, because a review reconsiders a prior court order, whereas a modification proceeds from a substantial change in circumstances. Thus, we also attach significance to the fact that the legislature spoke only of "modification" proceedings when it made the guidelines applicable through amended section 801(c). The absence of the word "review" in amended section 801(c) implies the legislative intent to exclude review proceedings. See *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 152 (1997) (where a statute lists the things to which it refers, omissions should be understood as exclusions).

¶ 57    We recognize that the Fourth District of the appellate court in *In re Marriage of Kasprzyk*, 2019 IL App (4th) 170838, ¶ 37, held that review proceedings fall within amended section 801(c)'s application. The Fourth District concluded that the "only" difference between the types of proceedings is the "basis for the trial court's authority to modify the original agreement." *Kasprzyk*, 2019 IL App (4th) 170838, ¶ 36. According to *Kasprzyk*, in review proceedings, the court itself provides authority to revisit its order, whereas, in modification proceedings, the legislature provides the authority. *Kasprzyk*, 2019 IL App (4th) 170838, ¶ 36.

¶ 58    We respectfully disagree with that reasoning. Ultimately, of course, it is the legislature, not the court, that provides the authority for both review and modification proceedings and sets the parameters of the relief that may be awarded. "[D]issolution of marriage is entirely statutory in origin and nature." *Strukoff v. Strukoff*, 76 Ill. 2d 53, 60 (1979). We adhere to our belief that the legislature would not have distinguished between modification and review proceedings in section 510(a-5) if that distinction were without a difference. "[E]ach word, clause, or sentence of a statute must not be rendered superfluous, but must if possible be given some reasonable meaning." *Peoria Roofing & Sheet Metal Co. v. Industrial Comm'n*, 181 Ill. App. 3d 616, 620 (1989). Nor do we believe that the legislature's 2015 imposition of the guidelines renders *Golden* obsolete, because (1) amended section 801(c) applied only to proceedings to modify a judgment and (2) the legislature retained the distinction between review proceedings and modification proceedings in section 510(a-5). Accordingly, we hold that the trial court did not abuse its discretion in failing to apply the guidelines in its review of the maintenance award.

¶ 59                            2. Judith's Petition to Increase Maintenance

¶ 60    Judith filed a separate petition to increase maintenance and alleged therein a substantial change in circumstances, in the belief that it was necessary to trigger a modification proceeding and thus avail herself of the guidelines pursuant to *Carstens*. Her attempt is unsuccessful because the JDOM provided for review of the maintenance award. Simply alleging a change in circumstances does not convert that review into a modification proceeding, because the allegation of a change in circumstances is superfluous in a review proceeding. Nevertheless, a review proceeding can result in a change in the nature and extent of maintenance. *Golden*, 358 Ill. App. 3d at 468. At oral argument, Judith agreed with this latter proposition.

¶ 61    Further, we agree with John that in substance Judith sought review of the maintenance award because the award was "inequitable." At trial, Judith testified that John and Williams misled her into believing that Williams represented her interests. She argued that $3000 per month was never sufficient to meet her needs. John testified that Judith herself suggested that amount, which she denied. At oral argument, Judith reinforced that she was seeking review of

the award, asserting that increased maintenance should be based on John's current elevated salary as compensation for the injustice of the award.

¶ 62 Even if Judith had sought a modification, a proceeding to modify maintenance is not a review of the equities of the original judgment. *Shive v. Shive*, 57 Ill. App. 3d 754, 762 (1978). In a modification proceeding, evidence of what occurred prior to the filing of the petition for a modification is irrelevant. *In re Marriage of S.D.*, 2012 IL App (1st) 101876, ¶ 41.

¶ 63 Nor is the fact that John now earns a much greater salary determinative of Judith's petition to increase maintenance. Maintenance is appropriate to ensure that a former spouse maintains the standard of living established during the marriage. *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 833 (1994). John was not earning $362,000 during the marriage. The parties stipulated that his salary was $182,000. Judith's lifestyle was thus established by what $182,000 provided. The court specifically declined to increase maintenance where Judith was "still enjoying the lifestyle she enjoyed during her marriage." She lived in the $395,000 marital residence, which was unencumbered. In addition, she possessed $1.2 million in assets, and she continued to travel, although some of her travel expenses were paid by third parties. She spent $700 per month on travel, dining out, and entertaining. The law does not require a party to pay more maintenance merely because he or she can do so. *S.D.*, 2012 IL App (1st) 101876, ¶ 44. Accordingly, we hold that the court did not abuse its discretion in denying Judith's petition to increase maintenance.

¶ 64 Next, Judith argues in four sentences that the court erred in failing to hold John in indirect civil contempt for his failure to pay several months of maintenance after the court declined to rule on his June 23 motion to abate maintenance pending trial. At oral argument, Judith withdrew this argument. Accordingly, we do not consider it.

¶ 65                                               III. CONCLUSION
¶ 66 For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 67 Affirmed.