2020 IL App (2d) 190451-U
No. 2-19-0451
Order filed April 27, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF LORENA K. MILLER, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 05-D-313 |
| JEFFREY A. MILLER, | ) ) ) | Honorable Rene Cruz, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

*Held*: The trial court erred in finding that respondent established a substantial change in circumstances that warranted a reduction or termination of his existing maintenance obligation. Reversed.

¶ 1 Respondent, Jeffrey Miller, petitioned the court, pursuant to section 510 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/510 (West 2016)), to terminate his maintenance payments to petitioner, Lorena Miller, in response to his retirement. The trial court granted the petition, in part, reducing the payments and ordering that they would again be reviewable once Lorena became eligible for Medicare.

¶ 2   On appeal, Lorena argues, in sum, that the court erred in determining that Jeffrey's change in employment status, alone, constituted a substantial change in circumstances warranting both a drastic reduction in maintenance and future review of her "permanent" maintenance. For the following reasons, we agree and reverse.

¶ 3                                    I. BACKGROUND

¶ 4 In 2007, Lorena and Jeffrey divorced after 25 years of marriage. The court split all non-retirement marital assets 55/45 in favor of Lorena. It split all retirement assets 50/50. Jeffrey was ordered to pay permanent maintenance at a rate of 41.44% of his income for the first four years, and 21.44% of his income thereafter. This would be accomplished by paying Lorena $3000 monthly, with an annual "true-up" depending upon the size of Jeffrey's bonus.  However, the court capped the total amount from which the true-up was to be calculated at $500,000.

¶ 5   In 2013, Jeffrey (who had re-married) petitioned the trial court to terminate maintenance  on the bases that Lorena was involved in a conjugal relationship and that she had failed to make good-faith efforts to secure employment. The trial court granted the petition on the first basis, but this court reversed. See *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 74.[1] On remand, the court denied both Jeffrey's request to decrease maintenance and Lorena's request to increase it.

¶ 6 In September 2018, Jeffrey again petitioned to modify or terminate maintenance.  He  alleged that, although he had been employed by PC-Tel, Inc., as a senior vice-president, in August

---

[1] This court noted that Lorena had moved to increase maintenance, in part, based on the fact that, although in its dissolution judgment the court anticipated that Lorena would obtain a four-year degree and then a job, she had not gained employment, despite having obtained a four-year degree. *Id.*, ¶ 7.

2018, the company announced a strategic reorganization that eliminated his position. On October 1, 2018, his position would end, and he would receive six months of severance pay. As respondent, age 63, was approaching normal retirement age and was precluded from working in his current field due to the terms of a 12-month, non-compete agreement, he intended to retire from gainful employment. Respondent alleged that the termination of his employment and his good-faith intention to retire constituted a substantial change in circumstances. He requested that the court terminate his obligation to pay maintenance.

¶ 7                                    A. Summary of Parties' Testimony

¶ 8 At hearing on the petition, Jeffrey testified in more detail about his former employment position, elimination of that position, and his decision to retire, as he had already planned to retire in 2021 at the age of 65. The good-faith basis for his decision to retire, instead of seeking future employment, is not at issue on appeal.

¶ 9   Jeffrey next testified that he planned to retire to Tucson, Arizona.  The decision to retire 2½ years earlier than originally planned caused Jeffrey to "reduce [his] spending profile." He and a friend own an airplane (fair market value listed on his financial affidavit as $80,000), that costs $750 monthly to maintain. He plans to sell the plane and should receive 40% of the proceeds (although he pays 100% of the costs associated with it). Jeffrey resigned his membership in a country club ($2000 monthly dues), cancelled his cleaning service, and terminated his home-alarm service. His Elgin home is a townhome with association fees ($158 monthly); he is listing the townhome for $295,900.  The home he and his current wife are purchasing in Arizona costs $490,000, and is a larger, single-family home. Jeffrey testified that, because of lower taxes, a 30-year mortgage, and no association fees, he anticipates that the monthly costs will be around the same as those for the Elgin home.  Jeffrey testified that he used savings to put down $42,000 for

the Arizona home. Jeffrey believed that he had made the adjustments necessary for he and his wife to account for the loss of employment income from the 2.5-year early retirement.

¶ 10 After December 2018, Jeffrey gave Lorena a lump-sum maintenance check for $71,200, which he believed represented the balance owed to reach the capped amount under the maintenance order. Jeffrey testified that, since completing his December 2018, financial affidavit, he had reduced his spending, as explained above, but that otherwise, as of November 21, 2019, it was "dead bang accurate." Jeffrey's affidavit reflected $388,603 as his "gross income last year." The affidavit listed a monthly deficit of $14,000, which he asserted he was meeting by withdrawing from his savings. However, he agreed that, on the line where it asked for gross income, he put down "nothing," because he was unemployed, even though in 2018 he had been paid $745,000 from his company in salary, parting compensation, etc. As to assets, in addition to his house, he had a $700,000 Vanguard account, $604,000 Snowden Lane Partners account, around $300,000 in a second Snowden Lane Partners account, and, around three years ago, he inherited about $140,000 from his father's estate (which appears to include a $60,000 retirement account). Further, he has $311,500 in a trust, $492,000 in another Snowden account with his wife (of which stock comprises the major component), and more than $100,000 in bank accounts with his wife. He had higher income in 2018, due to his severance package, but his W-2 from 2017 showed gross income of $442,085.68 and from 2016 his income was $296,517.97. Jeffrey owns a 2014 Porsche (fair market value listed as $38,000) and a 2012 BMW (fair market value listed as $11,000). Further, between leaving employment in October 2018 and the hearing in March 2019, Jeffrey and his wife took three trips out of Illinois (his affidavit lists $1500 in monthly vacation expenses). Finally, his monthly expenses listed on his affidavit include his current wife's expenses, although she makes no contribution to the monthly household expenses. (His wife has around $500,000 to $600,000

in assets, not including her pension). Some of the assets listed on his affidavit (like the house) were jointly owned with his wife.

¶ 11 As part of his separation agreement, Jeffrey's vesting schedule for 44,000 shares of restricted stock was advanced. He cannot sell some of the stock until he has been separated from the company at least six months (around April 2019), and some of it has reduced in value. He received a lump-sum severance payment of $140,000.

¶ 12  Lorena testified that she is 63 years old, was 24 years old when she married Jeffrey, and  she was a stay-at-home mom for a period of their 24-year marriage. She is not employed and has not sought employment since the dissolution. Lorena testified that she lives alone, and no one helps her pay her expenses.

¶ 13 Lorena lives without a mortgage in a home that she purchased for around $330,000. She owns a boat, purchased for $5800, which costs $1000 to store in the winter and $1800 to use in summer months. The boat is not "fancy;" it has no electricity or running water, and one cannot stand up in it.  She belongs to a yacht club, but the dues require only a $50 monthly food-purchase minimum. Lorena owns a 2000 Porsche (fair market value approximately $8500) and 2003 Lexus (fair market value approximately $9000). She acquired those vehicles at the time of dissolution; she did not purchase them afterwards. Lorena did not deposit the $71,200 check Jeffrey gave her in December 2018. Lorena's health insurance costs $1175 monthly. She is not currently eligible for Medicare.

¶ 14 During the marriage, Lorena belonged to the Elgin Country Club, but has not been a member since the divorce. When married, she and Jeffrey vacationed two to four times per year to destinations such as Belize or ski trips to Colorado; presently, post-dissolution, she has not been on vacation in two years. When asked if she has been able to maintain the lifestyle she enjoyed

during the marriage, Lorena testified "no." She further explained that, since the divorce, she does not spend the same amount of money on clothes and cannot afford to do certain things regularly, such as getting manicures or massages. Her lifestyle has changed.

¶ 15 Lorena testified that, if maintenance is terminated, she will be unable to meet her monthly expenses. She is not yet eligible for social security benefits or Medicare. Further, Lorena testified that it would be hard to maintain her home and that she would likely need to sell it. Further:

> "I'll probably have to liquidate stock to live off of that's in a savings account within Morgan Stanley. I'll probably have to sell off some assets within my home in order to be able to have living expenses to cover utilities, food, insurance."

¶ 16 Lorena agreed that her monthly expenses are around $5800. She has been receiving from Jeffrey $3000 in monthly maintenance. Lorena has approximately $1,000,000 in liquid assets. Jeffrey has around $2,400,000 in liquid assets.

¶ 17                                 B. Testimony from Financial Witnesses

¶ 18 John Coffey testified that he is a certified public accountant (CPA) and financial planner. He is not a certified financial planner or an actuary. After extensive examination concerning his methodology, Lorena objected to admission of his testimony and his qualification as an expert in financial planning; the court admitted both over her objection.

¶ 19 Coffey uses a financial software program called "MoneyGuide Pro" to help his clients with goal planning and to ensure that they have the right mix of assets. Coffey testified that the software runs a "Monte Carlo simulation" that makes assumptions of market conditions, runs approximately 1000 scenarios, and then produces probabilities of meeting one's goals.

¶ 20 Coffey received from Jeffrey the information and assumptions needed to run the Monte Carlo scenario to predict whether Lorena would have sufficient cash flow to retire based on a

giving spending pattern. Coffey received Lorena's financial affidavit, but he did not speak with her and made certain assumptions, such as that she did not plan to retire outside of Illinois, that she is a smoker, that her family longevity is "average," and that she has a life expectancy of age 85. Coffey reduced Lorena's annual spending by $13,980 annually at age 65, because that is when she qualifies for Medicare; he did not, however, account for the amount she would have to pay for Medicare coverage or any supplemental policies. He ran the calculations two ways: first, based on Lorena's *actual* current assets, future pension, and social security benefits; and, second, by imputing the assets Lorena *would have had*, if she had earned and saved all net income from a *hypothetical* employment earning $30,000 annually from 2010 through 2018.[2]

¶ 21 Based on scenario one, there was an 80% probability that she could maintain her lifestyle through her life expectancy. Based on scenario two, with a hypothetical savings and employment resulting in $205,000 in additional assets, there would be a 94% probability that she could maintain her lifestyle through her life expectancy. When Coffey re-ran the program, however, changing the assumption of life expectancy to age 93, the probability of Lorena having sufficient funds, even *with* the hypothetical savings, dropped to 78%. According to Coffey, all three scenarios fell into or above the "confidence zone" that Lorena should have sufficient funds to last the remainder of her lifetime. Coffey agreed that, if any one of the underlying assumptions were to change, the result would differ. The report did not plan for expenses of short- or long-term care, nor any other

---

[2] Apparently, Coffey first issued a report on January 8, 2019, showing that Lorena had a 70% or 80% likelihood of having sufficient money to last her lifetime. Jeffrey's lawyer then requested that he prepare another report with an assumption that Lorena had saved every penny of a net hypothetical income. The attorney represented that the trial judge had requested this hypothetical calculation.

catastrophic condition. He agreed that it is "absolutely right" that, if any of Lorena's circumstances change, his current opinion is not worth anything. Coffey did not perform the same type of analysis regarding Jeffrey's finances.

¶ 22 John Christensen testified on Lorena's behalf. He is a CPA and certified financial analyst, working with a firm that provides litigation support, including forensic accounting and income analysis and projections. Christensen was accepted as an expert. He was hired, along with his colleague, to critique Coffey's income analysis. In doing so, they performed calculations, used a financial planner, reviewed taxes and documents relating to Lorena's income and assets, and drafted a report reflecting the income and assets used for the software's analysis. Christensen disagreed with several of Coffey's assumptions, including: the creation of "phantom assets" based on the assumption that Lorena had $30,000 of annual income for several years and had saved it; the failure to account for taxes on income and assets, and the rates Coffey had applied to withdrawals from her assets; the failure to adequately account for declining markets and their impact on the assets; and the failure to consider that any savings experienced upon qualifying for Medicare would necessarily be impacted by expenses related to supplemental insurance, health care expenses with age, and the possibility of long-term care expenses. Christensen acknowledged that Lorena is a smoker, but nevertheless ran calculations to determine whether Lorena would have sufficient funds to live until age 99 (he testified he would have used age 99 for a non-smoker as well). Further, in his calculations, Christensen set aside $200,000 to avoid invading principal in a market crash and used ordinary (not capital-gains) tax rates. Christensen concluded that Lorena will run out of assets at age 77.

¶ 23 Christensen's report used the same base information as Coffey. He is not a financial planner. He disagreed that the comfort level identified by the software used by Coffey is, in fact,

a safe-enough level for someone to rely on for all of their lifestyle expenditures. "[B]ased on our client history and family history and people, personal relationships, having a 25 percent chance of outliving your assets is a very extreme reality in life. That does happen." Further, he understood that, to bring Lorena into a higher "comfort level," Coffey had to create phantom assets.

¶ 24 An exhibit attached to Christensen's report was prepared by a financial planner; Christensen was unable to explain the origin of the figure "$90,959" on one of the lines. He assumed it accounted for growth between certain years, but he was uncertain as to the reason why the increase had been calculated. Jeffrey's counsel thoroughly cross-examined Christensen on other purported errors and/or discrepancies in his report.

¶ 25                              C. Trial Court's Findings

¶ 26 In announcing its findings, the trial court first acknowledged this court's decision in *In re Marriage of Verhines*, 2018 IL App (2d) 171034, which it found suggested that a reduction in income on account of retirement status does not automatically create a substantial change in circumstances and that the question before it was whether Jeffrey, without unduly compromising his ability to meet his own needs, had the resources to meet his existing maintenance obligations. The court explained:

" *** when retirement is not a reversal of economic fortune but a natural life stage an obliger may be expected to reach into retirement assets to a reasonable degree to fulfill his obligations. The factors to take into account are the age of the parties, health of the parties, the motive for retirement, the receiving spouse's ability to be self-sufficient, and the obliger spouse's ability to pay."

¶ 27 The court next explained that it was charged with deciding whether there had been a substantial change in circumstances and whether the change in employment had been made in good faith. It found that there had been a change made in good faith.

¶ 28 Next, the court expressed that it must consider the needs of both parties. It found Coffey's alternative scenarios concerning Lorena's ability to support herself throughout her life expectancy "interesting." The court accepted that Coffey's scenarios were "best guess" predictions and that results could change if any underlying assumptions were to change, but it found that Christensen's testimony did not effectively undermine Coffey's report and, moreover, that Christensen could not explain some of the numbers in his own report. It noted that the original judgment awarded Lorena "permanent" maintenance, but, after four years, the percentage of that maintenance decreased with the expectation that she would acquire a four-year degree. The court had previously determined that "maintenance was intended to be permanent, that it was actually at [Lorena's] election whether she wanted to live off what she was now getting or whether she wished to earn more money in order to better her life situation, economic situation, and be able to continue to work." The court reiterated that Lorena chose not to join the workforce post-decree.

¶ 29 As to impairment in future earning capacity, the court acknowledged evidence about Jeffrey's specialized expertise and age, the stress employment took on his health, and the unlikelihood of finding another position in that field, but it noted that it had not heard evidence concerning any impairments Lorena had to her ability to earn income.

¶ 30 The court found that Lorena had received maintenance for around 12 years on a 24-year marriage. They had split the marital property and, although Jeffrey had restrictions on selling stock, due to his position with the company, Lorena had no such restrictions. As to increases or decreases in the parties' income:

"I've already indicated [Lorena's] unwillingness to enter into the workforce. And in the last years [Jeffrey's] income really hasn't changed very much, and I don't see that he's living an extravagant lifestyle either. He does have some things that a lot of us don't, which is a country club membership, but he's given that up because that's part of the plan to save money in terms of retirement. He was part owner in a plane, which he's also getting rid of because, again, that's one of the things that not all of us have but one of those adjustments that he made in order to try and set his retirement expenses—or reduce his retirement expenses.

One of the last comments [Lorena's counsel] made is that [Lorena] should not have to enter into—or start using her retirement assets to support herself. I would agree if she were much younger, but I think that she is right on the crux of the time frame where this is why you have retirement assets. She's just short of 65 as well. She should be able to start collecting Social Security in the not too distant future. This is I think exactly when she should be preparing for [that]."

¶ 31 The court noted that it would have been "nice" to hear from a financial planner on Lorena's behalf who could have prognosticated on what her use of her existing funds would have amounted to, other than one that just "pick[ed] holes" in Coffey's report. The court found that Lorena had around $1,400,000 in assets, and that Jeffrey had around $2,400,000 in assets. "The real only impact that [Lorena] has from [Jeffrey] retiring now I think *** is the impact this will have on her health insurance. It was unclear to the court whether or not the health insurance costs through Medicare and the supplement was included entirely in [Coffey's] calculations."

¶ 32 Therefore, the court found a substantial change in circumstances warranting modification of the maintenance. To account for Lorena's health insurance costs, the court reduced the

payments to $1300 monthly. It noted that the modification could be revisited when Lorena qualified for Medicare, and any future modification should take into account any associated supplemental costs. The court found:

"[Jeffrey] has lived a life that's been relatively modest outside of the couple of minors that were mentioned. I think he's been planning for retirement as he's been paying substantial amounts of maintenance for the last 12 years. [Lorena] unfortunately elected to not better her opportunities and better her position economically today by not entering into the workforce. The Court does take into account, I wasn't part of the original judgment, but it looks like [Lorena] at certain points had made up to $60,000 throughout the marriage until she became a stay-at-home mom. I think she has the ability to work there. [Jeffrey's counsel] had Mr. Coffey come up with about [$]30,000 a [year]. I don't know if that's a fair number or not.

\*\*\*

[$]30,000 a year, which could be a fair number, it could be low, it could be high, but I think [Lorena] put her own predictions potentially in jeopardy, her own financial condition in jeopardy as she starts to enter into that retirement phase by not engaging into the workforce."

¶ 33    Lorena appeals.

¶ 34                                    II. ANALYSIS

¶ 35  Lorena argues on appeal that the trial court's judgment, reducing maintenance and making it reviewable, rests on multiple errors of law. Specifically, she argues that the court failed to hold Jeffrey to his burden of proof on the question of substantial change in circumstances. Further, Lorena argues that the court improperly relied upon the fact that she is not employed.  Moreover,

she contends that the court ignored the applicability and force of the prior maintenance judgments in this case. Finally, Lorena asserts that the court accepted expert opinion testimony for purposes beyond the limits of its probative value.

¶ 36 Under the Dissolution Act, "[a]n order for maintenance may be modified or terminated  only upon a showing of a substantial change in circumstances."  750 ILCS 5/510(a-5) (West 2018). A "substantial change in circumstances" as required under section 510(a-5) means that either the needs of the spouse receiving maintenance or the *ability* of the other spouse to pay that maintenance has changed. *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 132. It is well-settled that the party seeking modification of maintenance has the burden of establishing that a substantial change in circumstances has occurred. See, *e.g.*, *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 14; *Shen*, 2015 IL App (1st) 130733, ¶ 132.

¶ 37 In determining whether to modify or terminate a maintenance award, a court considers the nine factors set forth in section 510(a-5) of the Dissolution Act:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4)  the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage *** and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage ***; and

(9) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/510(a-5) (West 2018).

¶ 38 Section 510(a-5) also requires that the trial court consider the factors relevant to a determination of an initial maintenance award set forth in section 504(a) of the Act. *Id*. §§ 504(a), 510(a-5). Those factors include the parties' income, property, and needs; the parties' realistic future earning capacities and any impairments to those earning capacities; the time necessary for the party seeking maintenance to acquire appropriate education, training, and employment; whether the party seeking maintenance is able to support himself or herself through appropriate employment; the effect of parental responsibility arrangements on the party seeking employment; the standard of living during the marriage; the duration of the marriage; each party's age, health, station, occupation, amount and source of income, vocational skills, employability, estate, and liabilities; tax consequences to each party; contributions and services by the party seeking maintenance to the education, training, or career of the other party; any valid agreement of the parties; and any other factor that the trial court finds just and equitable. *Id*. § 504(a).

¶ 39 We review a trial court's decision to terminate maintenance for an abuse of discretion. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009). A trial court abuses its discretion where no reasonable person would take the view adopted by the trial court. *In re Marriage of Walker*, 386 Ill. App. 3d

1034, 1041 (2008). When a party challenges a trial court's factual findings regarding a maintenance determination, we will not reverse a trial court's findings unless they are against the manifest weight of the evidence. *Id*. Findings are against the manifest weight of the evidence where they are unreasonable. *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61 (2009).

¶ 40 We address first Lorena's argument that the court failed to hold Jeffrey to his burden of proof. Specifically, she asserts that, while she does not, on appeal, challenge the court's findings that Jeffrey lost employment at age 63 through no fault of his own and that it was reasonable for him to retire without seeking future employment, it nevertheless wrongly used those findings to determine that the change in employment status, alone, warranted modification to maintenance. Relying on this court's decision in *Verhines*, Lorena contends that the relevant question is not simply whether Jeffrey has had a change in employment status; rather, the question is whether, looking at Jeffrey's financial position holistically, his present and future income, including from sources other than employment, allows him to satisfy his future maintenance obligations. She notes that section 504(a)(1) clearly obligated the court to consider the income and property of each party, which included the increased value or return that Jeffrey might receive on his investments that total approximately $2,400,000. She notes that the trial court correctly framed the issue as whether Jeffrey has the resources to meet his existing obligations without unduly compromising his ability to meet his own needs, but then it did not actually determine that issue or provide findings or rationale with respect thereto.

¶ 41 Lorena asserts that the trial court's failure to make findings referring to Jeffrey's ability to pay maintenance was inevitable, given that Jeffrey was the only witness to testify about his finances (which did not concern his ability to pay), and his opinion witness, Coffey, testified only regarding Lorena's finances. Lorena argues that Jeffrey's representation that he has reduced

spending cannot be accepted at face value, given that he is moving to a larger home that costs more to purchase and that his relocation required his other decisions, such as selling his airplane and surrendering his Elgin Country Club membership. "Significantly, the thrust of Jeffrey's modification of maintenance is that Lorena no longer needs maintenance because she has sufficient assets to last the period of her life expectancy," however, no comparable software assessment or other evidence was submitted to reveal that, absent a modification, *Jeffrey* was likely to run out of assets during the period of his life expectancy. The evidence showed only that Jeffrey had retired and had around $2,400,000 in assets. As such, Lorena contends, the court's failure to assess whether Jeffrey could afford to pay future maintenance at the judgment amount was flawed and its resulting findings unreasonable. We agree.

¶ 42 As previously noted, the party seeking the modification or termination of a maintenance obligation bears the burden of establishing a substantial change in circumstances sufficient to warrant the relief requested. See, *e.g.*, *Bernay*, 2017 IL App (2d) 160583, ¶ 14; *Shen*, 2015 IL App (1st) 130733, ¶ 132. Here, the court concluded that respondent had met his burden based principally upon his change in employment. However, as noted by this court in *Verhines*,[3] reduced income in retirement does not automatically constitute a substantial change in circumstances. *Verhines*, 2018 IL App (2d) 171034, ¶ 87. Indeed, retirement can simply reflect entry into a new life stage, rather than a reversal of economic fortune, particularly where the obligor can draw upon well-funded accounts to satisfy obligations. *Id.* ¶¶ 85-86. Therefore, "maintenance cases direct the court to take a holistic view of the obligor's financial position to determine whether he has the resources to meet his existing obligation without unduly compromising his ability to meet his own

_____

[3] The issue in *Verhines* concerned child support; nevertheless, this court relied upon maintenance decisions to guide the resolution.

needs." *Id.*, ¶ 86. For example, in *In re Marriage of Schrimpf*, the court held that, despite the obligor's reduced income in retirement, there had not been a substantial change in circumstances precluding fulfillment of the existing maintenance obligation, as the obligor had planned well for retirement and could access assets and other funds to meet his obligation. *In re Marriage of Schrimpf*, 293 Ill. App. 3d 246, 253 (1997). The court noted that, whether an obligor may rely upon retirement status to establish a substantial change in circumstances or whether he or she should be expected to reach into his or her retirement assets to meet existing obligations, should be determined on a case-by-case basis, considering factors such as age, health, motive for retirement, timing of retirement, the receiving spouse's ability to be self-sufficient, and the obligor spouse's *ability to pay*. *Id.* at 252. Similarly, in *Bernay*, this court reversed a trial court's termination of permanent maintenance, in part, finding that the obligor had not shown that his retirement income was insufficient to meet his maintenance obligation or that his health condition impacted his financial resources. *Bernay*, 2017 IL App (2d) 160583, ¶¶ 19-20.

¶ 43 Here, there was no evidence from which the trial court could have reasonably found that continuing to pay the existing maintenance obligation would unduly compromise Jeffrey's ability to meet his own needs. There was brief mention by Jeffrey that the demands of his job had affected his health, but certainly no evidence presented that his health has impacted his financial resources. As Jeffrey notes, had his position not been eliminated, he likely would have earned in excess of $750,000 gross over the remaining 2½ years he had planned to work; he asserts that he had anticipated earning at least $300,000 each of those years. "Jeffrey facing [2½] years of receiving no income from employment when he anticipated earning at least $300,000 per year constitutes a substantial change in circumstances." We disagree. The change in income does not, alone, reflect a change in circumstances that substantially impaired his *ability to pay the maintenance*. Again,

the question is not simply whether there exists a substantial change in circumstances; the question is whether it is a change that *warrants* the relief requested. The issue is not, as Jeffrey would characterize it, whether he has a burden to establish a *total inability* to pay; indeed, at oral argument, his counsel conceded that, as the party seeking modification, he must demonstrate a change in *ability to pay*. Jeffrey's change in income does not *automatically* reflect a compromised ability to pay his maintenance obligation; rather, it was his burden to connect his alleged impairment in ability to pay with his financial portfolio as a whole. Indeed, as Lorena notes in her reply brief, Jeffrey's financial affidavit suggests that he believes that he can afford to use his savings to spend $14,000 monthly without any contribution from his current wife to their joint expenses. Further, as Lorena notes, the affidavit does not "establish Jeffrey's income in retirement, nor does it present projections for his income from or anticipated return on investments, nor any analysis of the period for which his accumulated assets should last."

¶ 44 Jeffrey cites cases stating that a change of employment or reduction in income *may* constitute a substantial change of circumstances warranting modification (see, *e.g.*, *In re Marriage of Brent*, 263 Ill. App. 3d 916, 922 (1994)) and noting that a maintenance award can be modified when the *ability* of the spouse making the payments changes (see, *e.g.*, *In re Marriage of Reynard*, 378 Ill. App. 3d 997, 1003 (2008)). We have no quarrel with these general principles. Rather, we conclude that the court abused its discretion in finding those principles satisfied here, where, on the central question of ability to pay, the evidence did not really establish anything other than Jeffrey retired in good faith, reduced some spending, and has around $2,400,000 in assets. Indeed, it appears that, although the court was aware of the controlling cases and principles, it simply accepted that, because Jeffrey retired in good faith, had reduced some expenses, and had not lived an extravagant lifestyle, he could not meet his obligations. The court expressly acknowledged

Jeffrey's assets, but it did not assess whether Jeffrey's holistic financial picture allowed him to satisfy his maintenance obligation without unduly compromising his own needs. Again, Jeffrey presented no evidence from a financial expert that *he* would not have sufficient assets to last his life expectancy, or that his lifestyle would be unduly compromised, were maintenance not modified. Instead, the court rather heavily focused on Lorena's alleged ability to obtain employment. Indeed, in our view, rather than establishing, for example, that Jeffrey has retired and that the change in circumstances, *along with his financial situation as a whole*, reflects that his ability to satisfy his existing maintenance obligation without unduly compromising his needs is substantially impaired, Jeffrey's presentation of his case focused *instead* on the argument that he is retiring and Lorena should be fine without maintenance. Moreover, that argument went one step further (the record suggests possibly at the trial court's prompting) to suggest that, despite losing maintenance, Lorena would have been in an even *better* financial position had she hypothetically earned income for several years and saved it all. This was improper, at a minimum, because the analysis skipped over the first bedrock consideration of whether Jeffrey's ability to pay the maintenance was substantially impaired. We agree with Lorena that the reduced spending examples that Jeffrey and the court noted are inadequate to satisfy his burden; indeed, selling an airplane, and measures such as terminating a home alarm system, cleaning service, and club membership, when Jeffrey was planning to move out of state, do not necessarily reflect anything other than practical changes that needed to be made (and, indeed, there was no evidence that Jeffrey would not resume such services in his new life and home in Arizona). There was no evidence reflecting that the reduced spending was necessary because the *maintenance* obligation was creating an unreasonable burden on Jeffrey's financial resources.

¶ 45 In sum, the court's finding that Jeffrey met his burden of establishing that he suffered a substantial change in his financial resources that, in fact, impaired his ability to satisfy the full support amount was unreasonable. The court ruled in Jeffrey's favor, but did not answer the central question. As the substantial change in circumstances necessary to warrant a reduction in maintenance was not established, our analysis ends here. We reverse.

¶ 46                                III. CONCLUSION

¶ 47 For the reasons stated, the judgment of the circuit court of Kane County is reversed.

¶ 48 Reversed.